# United States' Exhibit 9

*United States v. Post Properties, Inc., et al.*

Civil Action No. 10-1866 (RJL)

Page 1

1                          MARK WALES

2            IN THE UNITED STATES DISTRICT COURT

3                FOR THE DISTRICT OF COLUMBIA

4

5      - - - - - - - - - - - - -x

6   UNITED STATES OF AMERICA,   :

7            Plaintiff,         :     Civil Action Number

8       vs.                     :     10-1866 (RJL)

9   POST PROPERTIES, INC.,      :

10    et al.,                   :

11            Defendants.       :

12    - - - - - - - - - - - - -x

13

14

15              DEPOSITION OF MARK W. WALES

16

17

18                  Washington, D.C.

19             Thursday, October 10, 2013

20

21

22   REPORTED BY:

23   CARMEN SMITH

24   JOB NO: 66669

25

1                           MARK WALES

2        Deposition of MARK W. WALES, called for

3   examination pursuant to notice of deposition, on

4   Thursday, October 10, 2013, in Washington, DC, at

5   the Department of Justice, 1800 G Street, NW, 7th

6   Floor, at 9:04 a.m., before CARMEN SMITH, a Notary

7   Public within and for the District of Columbia, when

8   were present on behalf of the respective parties:

9

10             MICHAEL MAURER, ESQ.

11             BETH PEPPER, ESQ.

12             United States Department of Justice

13             1800 G Street, NW

14             Washington, DC 20006

15             On behalf of Plaintiff

16

17

18

19

20

21

22

23

24                                  -- continued --

25

1                          MARK WALES

2     APPEARANCES (Continued):

3

4              RAFE PETERSEN, ESQ.

5              CHRISTINE WALZ, ESQ.

6              Holland & Knight

7              2099 Pennsylvania Avenue, NW

8              Washington, DC 20006

9              On behalf of Defendants

10

11

12

13

14    ALSO PRESENT: ALICE HUNG

15

16

17

18

19

20

21

22

23

24

25

1                           MARK WALES

2      accessibility requirements?

3           A     Depending on what's there, I -- those two

4      in particular, an entrance from the sidewalk into

5      the buildings.  The front desk, a public restroom,

6      if it's available.  I don't recall that there was

7      much else involved in those, as far as ADA was

8      concerned.

9           Q     Do you agree that the ADA covers leasing

10     offices of multifamily properties with four or more

11     units?

12          A     Yes.

13          Q     Do you agree that the ADA covers certain

14     public use areas of multifamily properties?

15                MR. PETERSEN:  Objection; vague.

16                THE WITNESS:  Yeah, by public use, those

17     areas that are open to the public, not just

18     residents and their guests.  Yes.

19                BY MR. MAURER:

20          Q     What are some of those?

21          A     For example, the entrance, the lobby, the

22     leasing area, a restroom possibly.

23          Q     And do you agree that there is a

24     particular standard for measuring compliance with

25     the ADA?

1                        MARK WALES

2       A      There is a standard, yes.

3       Q      And what is that standard?

4       A      Used to be called ADAAG, ADA standards.

5    That's the one that has been in effect for the

6    buildings that we've been looking at.

7       Q      And that standard is embodied in

8    regulations that are promulgated by the Department

9    of Justice; correct?

10      A      That's correct.

11      Q      And those are mandatory?

12      A      That's correct.

13      Q      Turning back to Exhibit F of what we

14   marked as Wales Exhibit 1, you refer under

15   "Consulting Experience" to develop -- the

16   development of alternative methods to meet codes and

17   standards.  To what are you referring?

18      A      That's geared toward building codes where

19   in the past I was very much involved in helping

20   architects develop ways to -- it was typically

21   involved in fire safety, where I would help them

22   come up with ways -- where building codes were a

23   problem for their design, I would help them come up

24   with ways to provide safety without necessarily

25   having to meet the specific requirements of the

1                        MARK WALES

2        A    A compliance review --

3        Q    For a building that has already been

4   constructed.

5        A    Such as those that we're looking at in the

6   Post matter?

7        Q    Yes.

8        A    I use the safe harbors.  I consider

9   research related specifically to accessibility, and

10  I consider my own experience and what I've learned

11  that is of things that are cited typically by the

12  Department of Justice in this case.

13       Q    Which safe harbors do you use?

14       A    I consider all of them.

15       Q    And which research do you use?

16       A    I've considered, as shown in my report,

17  research by Steinfeld.

18       Q    Is that the 1979 study?

19       A    Yes, Kara Kockelman.

20       Q    And you're talking about the studies that

21  Ms. Kockelman did in connection with litigation?

22            MR. PETERSEN:  Objection.

23            THE WITNESS:  She did research on slopes,

24  cross slopes in particular, that was -- I think was

25  originally for the highway department.  She received

1                    MARK WALES

2    award from the Federal Highway Administration for

3    her work in that.

4           And then eventually, she did do some work

5    for Edward Rose in the Edward Rose case as well.

6           BY MR. MAURER:

7       Q    And are those the studies to which you

8    were referring?

9       A    Yeah, I referred to a number of her

10   papers, meeting the intent of the ADA.  They're

11   listed in my report.

12      Q    Any other studies that you typically rely

13   upon?

14          MR. PETERSEN:  Asked and answered.

15          THE WITNESS:  Those are the main ones.  I

16   have considered the -- some Vredenburgh studies, one

17   was related to cross slopes on ramps and the other

18   was the effects of frost heave.

19          BY MR. MAURER:

20      Q    And both of those were -- both of those

21   studies were commissioned in connection with

22   litigation; correct?

23          MR. PETERSEN:  Objection.

24          THE WITNESS:  I'm pretty sure the frost

25   heave was, but I'm not sure about the other one, the

1                          MARK WALES

2     ramp.

3               BY MR. MAURER:

4          Q     What you do know is that Ms. Vredenburgh

5     and Ms. Kockelman have been retained by defendants

6     in accessibility cases; correct?

7          A     Yes.

8          Q     Now, the 1979 Steinfeld study, you rely

9     extensively on that; is that right?

10         A     I certainly considered it, yes.

11         Q     What gives you confidence about that

12    study?

13              MR. PETERSEN:  Objection; vague.

14              THE WITNESS:  Well, that study was used in

15    the -- the development of some of the criteria

16    included in the ANSI standards, early ANSI

17    standards.  And because of that, I went to those

18    studies to try to determine what was accessible.

19              BY MR. MAURER:

20         Q     How large was the sample size in that 1979

21    study?

22              MR. PETERSEN:  Objection; vague.

23              THE WITNESS:  I don't recall.  I think it

24    depended on what the study was related to.  There

25    were different kinds of studies that he did within

1                    MARK WALES

2    that.

3           BY MR. MAURER:

4      Q    How many participants were there?

5      A    I don't recall.  I think there was a few

6    hundred.

7      Q    How were the participants selected?

8      A    I don't recall.

9      Q    What was the age and the gender breakdown

10   of the participants?

11     A    I don't recall that.

12     Q    What assistance devices did the

13   participants use?

14     A    I know for some they used manual

15   wheelchairs, canes, braces, crutches.

16     Q    What were the dimensions of the

17   wheelchairs?

18           MR. PETERSEN:  Objection; vague.

19           THE WITNESS:  I don't recall.

20           BY MR. MAURER:

21     Q    I'm sorry, what was your answer?

22     A    I don't recall.

23     Q    The studies you rely on, were these

24   designed to -- let's look at the Vredenburgh study.

25   Were people given multiple opportunities to try the

1                         MARK WALES

2        Q    Have you heard of that study?

3             MR. PETERSEN:  Asked and answered.

4             THE WITNESS:  I don't think so.

5             BY MR. MAURER:

6        Q    So we were talking about your methodology,

7    and you talked about the safe harbors, research and

8    your own experience; correct?

9        A    Right.

10       Q    Is there anything else you'd consider?

11       A    I consider the safe harbors, other

12   technical assistance material, UFAS, ADA, things

13   like that.

14       Q    Anything else?

15            MR. PETERSEN:  Asked and answered.  He's

16   said it's in his report at least five times now.

17            THE WITNESS:  I don't think so.  It's in

18   my report.  My opinions are there.

19            BY MR. MAURER:

20       Q    So would you characterize your methodology

21   as objective or subjective?

22            MR. PETERSEN:  Objection; vague.

23            THE WITNESS:  My methodology?

24            BY MR. MAURER:

25       Q    Right.

1               MARK WALES

2      A     As -- what methodology in particular?

3      Q     In formulating opinions about what is

4   accessible.

5            MR. PETERSEN:  Objection.

6            THE WITNESS:  I'd say it's objective.

7            BY MR. MAURER:

8      Q     And in what respect is it objective?

9      A     Well, I'm not the only one that could make

10  the conclusions I make based on the method I use.

11     Q     Well, you've referred to a number of safe

12  harbors and a number of research items, and other

13  things that you review.  And I guess I'm trying to

14  understand, how would someone try to replicate your

15  methodology?

16     A     It's pretty simple.  Your own -- DOJ's

17  experts say that they look at all the safe harbors.

18            I look at all the safe harbors.  They are

19  not using the criteria to determine accessibility.

20            So, for example, where one of the safe

21  harbors -- take a light switch, for example.  One of

22  the safe harbors says it could be 54 inches, the

23  other one says 48, they choose to use the 48 and say

24  that anything above 48 inches is a violation of the

25  Act.

1                    MARK WALES        ,

2    considered a safe harbor?

3          And so if I find that in those technical

4    assistance materials I'm given something that says

5    this item that they have identified is covered under

6    a safe harbor, then I say it's okay, it's

7    accessible.

8          Q    But you also think things are okay even if

9    they're not accepted by any safe harbor, don't you?

10         A    In some cases, if I see that -- I look at

11   the research that's been done and I have identified

12   things that go beyond the safe harbors.  And the

13   reason I do that is because the Act is the only

14   standard that must be met, and the Act doesn't give

15   you technical requirements, technical criteria.

16         So I'm looking at it as is it accessible

17   or is it not.  And one method of doing that is to go

18   to research that more clearly defines what is

19   accessible.

20         The safe harbors are not minimum, they're

21   not mandatory.  And because they're not minimums, I

22   have to look at what is actually accessible.

23         I looked at Kockelman's work because 2

24   percent cross slope came out of the slope required

25   to drain water off of a surface, particularly a

1                    MARK WALES

2    concrete surface.  And that was not based on

3    accessibility for people with disabilities.

4              So when the new research came out, I

5    certainly considered that.

6              The ANSI standards, I was on the ANSI

7    committee for 13 years, and the ANSI committee

8    chooses numbers for their criteria because they will

9    choose one number, they don't always choose ranges.

10             So I look at Steinfeld's research to find

11   out what has research said?  What is accessible?

12   Not just what a safe harbor says, because a safe

13   harbor is not the minimum.

14   Q    And so if you have found some research

15   somewhere that suggests to you that someone is able

16   to use some feature, then that is deemed -- then you

17   deem that accessible?

18             MR. PETERSEN:  Objection; misstating his

19   testimony.

20             THE WITNESS:  I don't look for research

21   that says that someone can do something.  The

22   research that I looked at says that most people --

23   that the numbers that I choose are based on most

24   people.

25             BY MR. MAURER:

1                         MARK WALES

2       Q     In a particular study under particular

3    conditions?

4       A     For the studies that I looked at.  I look

5    at what most people can do.

6       Q     Under those particular conditions?

7             MR. PETERSEN:  Asked and answered.

8             THE WITNESS:  The -- under what -- I'm

9    sorry?

10            BY MR. MAURER:

11      Q     Under the conditions that were established

12   for the study?

13      A     Well, of course.  I don't think I'm going

14   to find answers in the study that are based on

15   conditions that they didn't use.

16      Q     Right.

17      A     So I would say yes.

18      Q     And how can somebody try to replicate your

19   methodology in assessing whether a feature is

20   accessible or not accessible?

21            MR. PETERSEN:  Objection; asked and

22   answered.

23            THE WITNESS:  Again, your -- DOJ's experts

24   and I do the same thing with the safe harbors,

25   except I'm looking for accessibility, they're

1            MARK WALES

2    difficult to reach a different conclusion, because

3    it's pretty simple.

4            MR. PETERSEN:  Are you good?

5            THE WITNESS:  Yeah.

6            MR. MAURER:  Do you want to take a break?

7            THE WITNESS:  Yes, please.

8            MR. MAURER:  Okay.  Off the record.

9            (Recess.)

10           BY MR. MAURER:

11    Q    Mr. Wales, I'd like to ask you a little

12    bit about the work you did in 2008 in connection

13    with the ERC versus Post litigation.  And your

14    expert report in that case is Exhibit B to what is

15    marked as Wales Exhibit 1, if you need to refer to

16    it.

17           So you say that you inspected 46 of Post's

18    properties; is that right?

19    A    I believe that's correct.

20    Q    And how did you decide -- well, let me ask

21    you this.  How much time did you spend at each

22    complex?

23    A    It depended on the size of the complex.

24    For example, Addison Circle, I think we were there

25    for about a week.

Page 79

1                          MARK WALES

2              Others, probably the equivalent of a day

3      and a half.  I think most of them we stayed a day

4      and a half or so.

5          Q    How many units did you measure -- would

6      you typically visit at each complex?

7          A    2008, I can't remember.

8          Q    Let me ask you this.  How do you go about

9      selecting or how did you go about selecting which

10     units to visit?

11         A    In 2008, I think we tried to group units.

12     That's typically how we do it, we group them into

13     similar units with similar bathrooms and kitchens,

14     and then depending on how many there are, we'll --

15     if we have to eliminate some or if we have to -- you

16     know, if there's not enough time or something, we

17     may take out the ones that represent the least

18     number of units so that we get a cross-section of

19     units that cover as much as possible.

20         Q    So you didn't necessarily visit each unit

21     type; is that correct?

22         A    In 2008, I don't recall if we did or

23     didn't.  This time we didn't look at every unit

24     type.

25         Q    And did you visit -- okay.  So you say

1                   MARK WALES

2        Q     Even though the Fair Housing Act says all

3    the doors, if HUD provides something that you think

4    is different, then you rely on what HUD says?

5        A     I don't believe adaptability means that

6    you don't have it in place at time of construction.

7        Q     So in your view, with respect to doors,

8    passage doors, what has to be in place at the time

9    of construction?

10       A     Doors that are intended for user passage

11   have to be wide enough for a person in a wheelchair.

12       Q     And what does "wide enough" mean?

13       A     Generally, I use 29 to 30 inches.  In

14   reality, it could be less.  But I typically use 29

15   to 30 inches.

16       Q     And that's for all doors?  I mean, entry

17   doors and doors within units that -- for passage?

18       A     Yes.

19       Q     And that's 29 to 30 inches clear?

20       A     Right.

21       Q     So basically 29 inches would be

22   accessible, in your opinion?

23       A     Yes.

24       Q     And from where do you derive that opinion?

25       A     Research, findings, other things that

1                    MARK WALES

2      indicated -- for example, in one of the ANSI

3      standards, the -- in the appendix to, I think,

4      the '86 ANSI standard, they say 30 inches there.

5      And in the proposed guidelines, there was a proposal

6      for 29, border I think it was.  And HUD didn't --

7      HUD recognized that narrower doors were accessible,

8      but they chose to use the nominal 32-inch door, and

9      stated that they had viewed the 32-inch requirement

10     as -- as nominal door width for all doors.

11          Q     For interior doors, the non --

12          A     For all doors.

13          Q     So I'm sorry, I'm not sure I understand.

14     You're saying -- where did HUD state that it could

15     be 30?

16          A     They stated that they recognize that

17     narrower doors were usable, and they stated that the

18     nominal 32-inch door was what they considered

19     reasonable for all doors as far as the doors meeting

20     the Fair Housing Act.

21          Q     Where does HUD say that?

22          A     In the proposed -- let's see, I think it

23     was in the preamble to the final guidelines.

24          Q     Do any of the safe harbors, the 10

25     recognized safe harbors, allow for 29-inch-wide

Page 133

1                        MARK WALES

2     doors?

3          A    No.

4          Q    What specific research are you relying on

5     for your opinion regarding 29-inch doors?

6          A    Steinfeld and the other research that

7     Steinfeld talked about in his door analysis.  He

8     brought up several other studies that had been done.

9     And then the other technical guidance like Selwyn

10    Goldsmith, Designing for the Disabled.

11         Q    And which Steinfeld study are you

12    referring to?

13         A    The 1979 -- '79 or '74.  The work that was

14    done on behalf of HUD and included in the -- it was

15    the basis of some of the ANSI standard requirements.

16         Q    And what, in your view, was Steinfeld's

17    conclusion about door widths?

18         A    He -- it showed that most people could

19    negotiate, I don't remember exactly what the

20    dimension was, but I think it was 30-inch doors.

21         Q    Okay.  That was 30 inch, but you say 29

22    inch is acceptable?

23         A    I don't know exactly what -- which number

24    came from where, so I think I've given you most

25    every one of the ones that I looked at.

1                    MARK WALES

2       Q    So one study said 30 inches and another

3   study said 29 inches?

4       A    No, I think that -- I think that some of

5   the -- the 29 may have come out of some of

6   Steinfeld's writing about door widths that included

7   other people's research.  And again in the Fair

8   Housing proposals, one of the options had used a

9   narrower door, like 29 or 29-1/4, something like

10  that.  And I think Selwyn Goldsmith may also have

11  recommended a narrower door.

12      Q    So there were some research findings that

13  said 30 inches was the -- was the preferred width;

14  is that right?

15      A    Yes, I think so.

16      Q    So there's some disagreement among the

17  researchers back then?

18      A    Well, different people came up with

19  different numbers.  So I don't know if that's a

20  disagreement or just the results of their studies.

21      Q    And you go with the narrower number?

22      A    I gave -- I gave numbers that I thought

23  were indicated to be accessible.

24      Q    Do you think that the study, whichever

25  study it was that came up with 29 inches, that that

Page 135

1               MARK WALES

2    was more reliable than the one that came up with 30

3    inches?

4         A    No.

5         Q    Is it --

6         A    But I think that -- I mean, our -- the

7    ANSI standard, '86 ANSI standard, was based on a

8    large wheelchair used by a large adult male, and

9    that wheelchair was 26 inches wide.  Typically, the

10   standard wheelchair has been considered 24-1/2

11   inches wide.  So I think most people can negotiate

12   those numbers through doorways.

13        Q    Are motorized wheelchairs larger typically

14   than nonmotorized wheelchairs?

15        A    There are so many, I don't know.  But they

16   weren't included in the ANSI standard numbers.

17   There was a specific wheelchair size which was

18   considered to be large.

19        Q    And have you looked at any studies since

20   the Steinfeld study from 1979 as a basis for your

21   conclusion about door widths?

22        A    No, those are the only ones I'm aware of.

23        Q    And is it your opinion that a door width

24   that is narrower than 29 inches would violate the

25   Fair Housing Act?

1                    MARK WALES

2              MR. PETERSEN:  Objection; vague.

3              THE WITNESS:  The Act doesn't give any

4    technical criteria.  There are no·specific

5    standards.  There's no enforceable standard adopted

6    by the Fair Housing Act.  So I look at the safe

7    harbors, I look at research, and I try to determine

8    what is accessible.

9              The numbers that I gave, I think, are

10   reasonable, and though some doors in reality,

11   narrower doors, may be accessible, that's not a

12   standard that I've used.

13             BY MR. MAURER:

14        Q    In your opinion, is a door that is

15   narrower than 29 inches not accessible?

16             MR. PETERSEN:  Objection; vague.

17             THE WITNESS:  No.

18             BY MR. MAURER:

19        Q    I'm sorry, I couldn't hear you.

20        A    No.

21        Q    And I'm not sure -- I want to make sure

22   that I understood your testimony.  So you would

23   agree that a door that is narrower than 29 inches is

24   not accessible?

25        A    As I said, in reality, where the door is,

Page 137

1                        MARK WALES

2     what the door is going to, it may be accessible.

3     But it's not a standard I've used.  I've used 29 to

4     30 inches as what I used to determine what was

5     accessible under the Fair Housing Act.

6          Q    And you would agree that you have to apply

7     a standard of some kind; right?

8          A    Well, not necessarily.  ,I mean, the Act

9     doesn't give you a standard.  The Act doesn't give

10    you technical criteria.  So you have to make some

11    determinations, but, for example, if you're not

12    going all the way into the door, if you're not

13    passing through the door, you know, then the front

14    of a wheelchair is narrower than the back of a

15    wheelchair, so it wouldn't necessarily have to be 29

16    inches even.

17         Q    How narrow could it be?'

18         A    Well, the wheelchair used in the ANSI

19    standard was about 8, 10 inches wide in the front.

20    So if you have a -- something that's 20 inches wide,

21    you'd probably be able to use some of those doors.

22              But they're not -- they're not passing

23    through necessarily.

24         Q    But for a passageway door, let's say --

25    let's use as an example the front entrance door to a

1                     MARK WALES

2   covered unit.  How narrow do you think that door

3   could be and still be accessible?

4        A     29 to 30 inches.

5        Q     So 29 inches?

6        A     Right.

7        Q     And in your opinion, then, would a 28-inch

8   front door not be accessible?

9             MR. PETERSEN:  Asked and answered.

10            THE WITNESS:  Assuming it's required to be

11  accessible, then, like I said, in reality, it may be

12  accessible.  But by my standard, no.

13            BY MR. MAURER:

14       Q     So if you were doing a compliance analysis

15  of a property and you measured the entry door and it

16  measured at 28 inches, would you cite that as a

17  violation?

18       A     If I were doing a compliance -- and I

19  don't know that it's a violation of the Act, but

20  it's -- it's probably not accessible.

21       Q     You say that secondary doors do not have

22  to meet the accessibility requirements.  What's the

23  basis for your opinion?

24       A     I looked at what Congress said in their

25  House report, and they said that they expected a --

1                          MARK WALES

2      carpets that would be considered inaccessible by the

3      ANSI standard.

4              So you're allowed to have inaccessible

5      flooring throughout the unit, and if you can't

6      maneuver a wheelchair on that carpet, then your

7      option is to do a reasonable modification and change

8      the floor covering.  That's a lot more expensive

9      than changing a threshold or doing one of these

10     other things that are allowed under the Fair Housing

11     guidelines and the Fair Housing design manual.

12             All of these things are allowed.

13     Q     So in your view, what is the maximum

14     allowable threshold height, if any?

15     A     Again, I don't think that the Fair Housing

16     Act addresses the threshold height.  I think that's

17     something that HUD came up with and put in their

18     recommendations, which are not requirements under

19     the law.  And so I don't think that thresholds are

20     really regulated by that.

21     Q     So is there any maximum, in your opinion,

22     for a threshold in a built unit?

23     A     No.  I think they can be -- they're just,

24     you know, a half-inch threshold may not be

25     accessible to some person.  Someone else might be

1                         MARK WALES

2    able to go over a 4-inch threshold.

3               So either way, those things are subject to

4    adaptability.

5        Q    So there's no -- there's no standard for

6    what needs to be included at the time of design and

7    construction in terms of threshold heights, in your

8    opinion?

9        A    That's correct.  And --, and I base that on

10   the guidelines as far as allowing sunken living

11   rooms, allowing 4-3/4-inch drops at the balconies or

12   patios.

13       Q .  Right, but in terms of internal

14   thresholds --

15       A    Allowing -- allowing carpet that may not

16   be accessible to someone, those things are all

17   adaptable features.

18       Q    And so those are all things that the

19   tenant should be required to pay for?

20       A    I don't think it's a matter of -- I think

21   that's part of the law.  Reasonable modifications

22   requires that the tenant pay for that.

23              If the tenant wants to change the carpet,

24   then you're -- I mean, the guidelines would require

25   that -- don't have a requirement for carpet.  The

1                    MARK WALES

2    tenant would be required to pay for the carpet.

3           If the tenant wants a route into their

4    sunken living room, the tenant would have to build a

5    ramp system or some kind of a lift system to get

6    down into their sunken living room.

7        Q    Right.  I'm just asking you right now

8    about threshold heights.

9        A    I'm addressing that.

10       Q    Okay.  So --

11       A    Because there's no difference between a

12   threshold height and a sunken living room or a

13   drop-off at a balcony.  It's the same issue.

14       Q    So it can be any height?

15       A    Yes.  I don't think you will run into just

16   any height.  But yeah, that's -- that's true.

17       Q    So in terms of light switches and

18   environmental controls, what is your understanding

19   of what the Fair Housing Act requires?

20       A    The Fair Housing Act requires that the

21   unit contains light switches, electrical outlets,

22   thermostats, environmental controls that are

23   accessible.  It doesn't require that they all be

24   accessible.  And beyond that, they're a feature of

25   adaptability.

Page 195

MARK WALES

1

2      Q      In your opinion, what is meant by
3    accessible locations?

4      A      According to Congress, in the House
5    report, it was neither too high nor too low.  But
6    they didn't expect that they were going to find
7    waist-high stuff everywhere.

8      Q      So what's the primary or basic spatial
9    component that has to be in place as to
10   environmental controls?

11     A      That one is not based on a spatial
12   requirement.  You're not going to have to do
13   structural changes, typically, to adapt controls
14   that are -- need to be moved based on someone's
15   particular need.

16     Q      So where does an environmental control or
17   thermostat need to be at the time, of design and
18   construction?

19     A      Are you speaking of height?

20     Q      Yes.

21     A      Okay.  The Steinfeld research indicates
22   that most people can reach 72 inches, and I believe
23   it's 84 percent of the people can reach 66 inches.
24   So I generally use the 66 inches as a -- as a
25   standard to see if it's within reach range.

Page 196

1                          MARK WALES

2          Q     Do any of the safe harbors use 66 inches

3     as the standard?

4          A     No.

5          Q     What is the highest range that a safe

6     harbor uses?

7          A     For a thermostat, 54 inches.

8          Q     So if a thermostat is higher than 66

9     inches and you were doing an accessibility analysis,

10    would you cite that as noncompliant?

11         A     I might take a note of it.  My

12    recollection is that I don't recall seeing them that

13    way.  If there ever were, it would have been very

14    few in the many hundreds of apartments, so --

15         Q     You're referring to Post properties?

16         A     Yeah.  It would have been an anomaly.

17         Q     But in your view, would a 70-inch-high

18    environmental control, would that be an accessible

19    location?

20         A     According to Steinfeld's research, 72

21    was -- was about the maximum.  And so I don't think

22    that that's -- that's not something I would think --

23    I would think I would find typically.  Like I said,

24    it might be an anomaly.

25               The -- typically, manufacturers used to

1               MARK WALES

2  recommend 60 inches, just for taking care of the air

3  strata to make people comfortable and make the units

4  efficient.  That's what we were taught when I was in

5  school, that 60 inches was the right number.

6        And it wasn't until accessibility

7  standards were written to bring them down to 54 that

8  I started seeing that.

9        So if I found one that was 70 inches, I'd

10 probably take a note of it, but I wouldn't be too

11 concerned about it.  It would be something that was

12 very unusual and something that is easily adaptable.

13    Q    So do you consider 70 inches to be an

14 accessible location?

15         MR. PETERSEN:  Asked and answered.

16         THE WITNESS:  I think it is accessible,

17 yes.

18         BY MR. MAURER:

19    Q    Based on the Steinfeld study?

20    A    Steinfeld, yeah.

21    Q    From 1979?

22    A    If that was the year, yes.  I typically

23 use 66, though.  In my report, I think I say 66.

24    Q    And that was also in the Steinfeld study?

25    A    Yes.

Page 198

1                       MARK WALES

2       Q     Are there any other studies you rely on

3   for your opinion about light switches and

4   environmental controls?

5       A     I think that was the one I used.  I don't

6   recall others.  Of course, I've considered the --

7   all the Fair Housing objective standards as well,

8   and oftentimes I find that DOJ's experts cite

9   anything over 48 inches, which is one of the safe

10  harbors -- the Fair Housing guidelines came up with

11  48 inches even though the ANSI standard at the time

12  said 54.

13            Later the ANSI standard was changed to 48

14  inches, but it wasn't based on wheelchair users.  It

15  was based on Little People of America, particularly

16  Angela Van Etten came to the ANSI standards

17  committee and proposed 48 inches.

18            Angela is an attorney, was living in Miami

19  at the time, and she had done her own research at a

20  Little People of America convention and had people

21  reach.  And she decided 48 inches was the best

22  number.

23            I didn't think it was a good idea at the

24  time to change the standard based on that because

25  there was -- that was the kind of research that we

1                    MARK WALES

2    then there's -- in order to leave that curb and go

3    run into a protruding object, you would have to turn

4    off of your normal course to go hit it.

5           So those are the kinds of things that I

6    consider location.

7       Q    Okay.  So the location would be a factor

8    in your determining what the standard is?

9       A    Right.

10           MR. MAURER:  Let me mark this as 15.

11           MR. PETERSEN:  This isn't going in?

12           MR. MAURER:  I don't think we need to.

13           (Wales Exhibit 15 identified.)

14           (Recess.)

15           BY MR. MAURER:

16       Q    Mr. Wales, you have in front of you what

17    has been marked as Wales Exhibit 15.  And for the

18    record, these are four pages from your notes that

19    were produced to us.  Do these look familiar?

20       A    Yes.

21       Q    Okay.  So I'm -- the first page is from

22    Post Square.  And I'm really trying to ascertain

23    what your codes are here.  So if we could start at

24    unit 267, could you tell me how to read that top

25    line?  What does T stand for?

1              MARK WALES

2      A    Yeah, I assume this is Post Square.  It's

3  not on here.  And T is thermostat.

4      Q    And that's 45-1/2 inches?

5      A    Right.

6      Q    And S is?

7      A    Switch, switches.

8      Q    And O is?

9      A    Outlets.

10     Q    And K is?

11     A    Kitchen.

12     Q    And B is?

13     A    Bathroom.

14     Q    And what do the dimensions after K and B

15  refer to?

16     A    The outlet height above the countertop.

17     Q    Okay.  What is -- going down, it says

18  "22-1/4 Ba-K"; is that right?

19     A    Three -- we called it balconettes.  The

20  NIUP was not intended for user passage.

21          This was a long time ago so I'm not

22  familiar with all of these.  I assume that was a --

23  a balcony, or 22-1/4 was from maybe a width from

24  some place to the kitchen.

25     Q    Would that be a bathroom?

1                   MARK WALES

2     A    I doubt it.  It might be.

3          But there was an alternate route

4 available.  It appears to have something to do with

5 a route.

6     Q    Okay.  And below that, RF-CT?

7     A    Refrigerator to countertop.  39-and-7/8.

8     Q    And that's measured below the countertop?

9     A    Yes.

10    Q    And I can't make out the --

11    A    Countertop to countertop, 53-and-3/8.

12    Q    And I can't make out the letters

13 underneath that.

14    A    Underneath --

15    Q    On the left, under -- under RF-CT.

16    A    RG, CL, 18-and-7/8, that's a range center

17 line, 18-and-7/8, to the cabinet base, there's an

18 angled countertop there.

19    Q    And then below that?

20    A    WCCL is water closet center line,

21 18-1/8-inch.  And the LAV center line is 24.

22    Q    And why do you measure center lines?

23    A    Because I expect particularly then, I was

24 measuring them because I wasn't sure what I would be

25 looking at when I received the reports from DOJ's

1                      MARK WALES

2    expert, or ERC's experts in that particular matter.

3    So I just made -- I knew what they would typically

4    be measuring, so I measured those things to have

5    some indication of what I could expect.

6        Q     How do you use those measurements, if you

7    do, to calculate clear floor space?

8        A     I don't.  Clear floor space, are you

9    talking about a clear floor space for a wheelchair,

10   a 30-by-48-inch clear floor space?

11       Q     Right.

12       A     You don't use these to calculate the clear

13   floor space.

14       Q     So why do you -- why do you -- what do you

15   do with those measurements?

16       A     I kept them so that I could -- I have to

17   respond to DOJ's consultants or experts.  So I

18   measured all these things so that I could respond to

19   their -- to what they say.  Because I don't know --

20   I have no idea what they're going to say, so I need

21   to have some indicators of what's there.

22             If they came back and said the LAV center

23   line is 23 inches, then my response would be clear

24   floor space is not required to be centered on a

25   lavatory, and besides, this one is.

1              MARK WALES

2      Q    All right.  Looking at unit 276, just

3  beneath that, skipping down two lines, MBA, I guess

4  that's line 15, what is that stand for?

5      A    Master bath.

6      Q    And what's the measurement you have there?

7      A    42-1/4.

8      Q    And then what is the number underneath

9  master bath mean?

10      A    Number 2, it's second bathroom.

11      Q    And then on line 17, could you take me

12  through that.

13      A    Balcony threshold, half-inch interior,

14  exterior, 7/16.  Change of level, 1-and-3/8.

15  Concrete deck.

16      Q    And then on line 19?

17      A    Master bath, I guess that's door, living,

18  21-and-5/8, alternate available.

19      Q    So that's a door from the master bath to

20  the living room is 21-and-5/8?

21      A    I don't know if that's a door or an

22  accessible route.  Sometimes there's just openings

23  that go around a wall, and so it may be one of

24  those.

25      Q    Then below that on line 21, it says

1              MARK WALES

2   "Laundry," and there's a number after that?

3        A    27-and-3/4.

4        Q    And what is that a measurement of?

5        A    Hang on a second.  I don't know.  I'd have

6   to look at my -- I'd have to look at my pictures and

7   probably a plan to figure that out.

8        Q    All right.  Well, continuing along line

9   21, what -- read what's after that.

10       A    Starting at 22?

11       Q    No, on line 21 after the laundry

12   measurement.

13       A    Oh, I don't know.  Washer.

14            And it says -- I think it says door

15   casing, and then 8, and I don't know what the rest

16   of that says.  I'd have to -- so I'd have to see

17   pictures and stuff.

18       Q    Okay.  At line 24, could you take me

19   through what that indicates?

20       A    Refrigerator, 5 from rear wall.

21   Refrigerator to countertop, 26-3/4.  Countertop -- I

22   mean I think that's cabinet base to refrigerator is

23   27 and one quarter.

24       Q    What does the 5 mean after refrigerator on

25   line 24?

1                          MARK WALES

2        A    It means the refrigerator was pushed out

3   away from the wall 5 inches.

4        Q    And on line 25?

5        A    I'm not sure what that is.  It's

6   something -- it's a measurement to a countertop near

7   the sink of 34-1/2 inches, and the same thing to

8   a -- the cabinet base.  I think that's -- I think

9   that's near the entrance where the cabinet base and

10  the wall are.

11       Q    And it's 35 inches?

12       A    Yeah.

13       Q    And 35 inches measured from where to

14  where?

15       A    I don't know.  I can't tell from just

16  reading these notes.  It looks -- it appears to be

17  somewhere at a cabinet base and wall, which

18  typically indicates it's at the entry, kitchen

19  entry.

20       Q    All right.  And line 26, the alcove, could

21  you tell me what those measurements are?

22       A    Oh, yes.  Closet center line, 17, alcove,

23  45-and-7/8 deep by 35-1/2 wide.

24            And there's a tub, I don't know how that's

25  laid out, but I'd have to see.  But it may be

1                          MARK WALES

2      between something and a tub, or at the end of a tub.

3          Q    Okay.  Let me turn to the next page, page

4      2 of what we've marked as Wales Exhibit 15.  And for

5      identification purposes, at the bottom, there are a

6      couple of codes, one at the bottom says MW-D-1106.

7          A    Oh, okay.  I was looking at my notes

8      trying to find that.  Never heard that one.

9          Q    So this is Post Spring; correct?

10         A    Yes.

11         Q    And what does PS and AA stand for?

12         A    Parking space, access aisle.

13         Q    And what are the numbers underneath both

14     those columns?

15         A    Oh, running slope and cross slope.

16     Running slope first, slash, cross slope.

17         Q    And a couple lines below that to the left,

18     I think it says CR.

19         A    Curb ramp.

20         Q    And what's that measurement?

21         A    4.4.

22         Q    And several lines below that, at the

23     picnic area, what are those references?

24         A    Where are you talking about?

25         Q    It says 353-359.

1          MARK WALES

2     A     That's what you're asking me about, those

3     numbers?

4     Q     Yes.

5     A     I think that's probably near those units.

6     It's on the -- yeah, I think that's unit numbers.

7     Q     All right.  Let me turn to the next page

8     and at the very bottom, this page is labeled

9     MW-D-321.  And at the top, it says "step up 712" is

10    that correct?

11    A     Right.

12    Q     What does that mean?

13    A     There's a step up at 712 somewhere.  I'd

14    have to look at the plans and the -- my drawings.

15    Q     Okay, so step up --

16    A     Pictures and all of that.

17    Q     But step up means a step?

18    A     It sounds like it.  Yeah, it looks like

19    it.

20    Q     And then under where it says building 800?

21    A     Yes.

22    Q     You say "curb," and what are the numbers

23    after that?

24    A     That's a curb -- a 6-inch curb and three

25    6-inch risers to those particular units, units 802

1                    MARK WALES

2   and 803.

3        Q    And below that, there are -- if you would

4   just tell me what that means below -- the text below

5   that.

6        A    The text below that?

7        Q    Below units 802 and 803.

8        A    Oh.  Left side entrance, curb, 6 inches,

9   three 6-inch -- or five 6-inch risers.

10       Q    And that's from where to where?  Where are

11   those 6-inch risers?

12       A    I don't know.  I can't -- I can't tell by

13   looking at this.

14       Q    But risers mean steps?

15       A    Yes.

16       Q    Okay.  And does that say that there's a

17   gravel path between 800 and 900?

18       A    Yes.

19       Q    And there's one step at 814 and one step

20   at 811?

21       A    Right.

22       Q    And one step at 804 and what's that other

23   number?

24       A    I think it's 801.

25       Q    And then on the last page --

1                        MARK WALES

2        A     Where is this?

3        Q     I'm sorry, that's toward the bottom of --

4        A     No, where is this property?  This is

5   Spring, did you say?

6              MR. PETERSEN:  I don't know that he's

7   identified it.

8              BY MR. MAURER:

9        Q     I think this is Post Glen.  And then

10  turning to the last page of Wales Exhibit 15, which

11  again for identification at the bottom is MW-D-2352,

12  and this is Luminaria.  And at the bottom line,

13  extra roof-deck, what does that say?

14       A     Stairs.

15       Q     And does that mean there are stairs to the

16  roof-deck?

17       A     Yes.

18              MR. MAURER:  Off the record.

19              (Recess.)

20              MR. MAURER:  Just a few final questions.

21  Let me go ahead and mark this, please, as Wales

22  Exhibit 16.

23              (Wales Exhibit 16 identified.)

24              THE WITNESS:  Oh, I remember this.

25              BY MR. MAURER:

Page 269

1                       J U R A T

2

3    I,            , do hereby certify under

4    penalty of perjury that I have read the foregoing

5    transcript of my deposition taken on            ;

6    that I have made such corrections as appear noted

7    herein in ink, initialed by me; that my testimony as

8    contained herein, as corrected, is true and correct.

9

10   DATED this _6_ day of _November_, 20⅓,

11   at _Lafayette Parish_, LA      .

12

13

14

15

16

17   _____

18   SIGNATURE OF WITNESS

19

20

21

22

23

24

25