# United States' Exhibit 10

*United States v. Post Properties, Inc., et al.*

Civil Action No. 10-1866 (RJL)

1

2                    IN THE UNITED STATES DISTRICT COURT

3                      FOR THE DISTRICT OF COLUMBIA

4

5     UNITED STATES OF AMERICA,    )
                                   )
6                    Plaintiff,    )
                                   )
7              vs.                 )
                                   )   Civil Action No.
8     POST PROPERTIES, INC.,       )   10-1866(RJL)
      et al.,                      )
9                                  )
                     Defendants.   )
10    _____  )

11

12         DEPOSITION OF ALISON VREDENBURGH, PH.D.

13                    350 10TH AVENUE

14                 SAN DIEGO, CALIFORNIA

15               TAKEN ON OCTOBER 15, 2013

16

17

18

19

20

21

22

23    Reported By:

24    PATRICIA L. HUBBARD, CSR #3400

25    JOB NO. 66782

1          DATE:  OCTOBER 15, 2013
2              TIME:  9:52 A.M.
3
4
5          DEPOSITION OF ALISON VREDENBURGH,
6          PH.D., taken on behalf of the
7          Plaintiff, at 350 10th Avenue,
8          Suite 1000, San Diego, California,
9          commencing at 9:50 A.M. on
10         October 15, 2013, before PATRICIA L.
11         HUBBARD, CSR #3400, a Certified
12         Shorthand Reporter in and for the
13         State of California, pursuant to
14         Notice.
15
16    APPEARANCES OF COUNSEL:
17
      For the Plaintiff:
18
          UNITED STATES DEPARTMENT OF JUSTICE
19         HOUSING AND CIVIL ENFORCEMENT SECTION
          CIVIL RIGHTS DIVISION
20         BY:  COLLEEN MELODY, ESQ.
               BETH PEPPER, ESQ.
21             ALICE HUNG, ESQ.
          1800 G Street, N.W.
22         Washington, D.C.  20006
23
24
25

1    APPEARANCES OF COUNSEL:   (Continued)

2

    For the Defendants:

3

            HOLLAND & KNIGHT

4           BY:   LYNN CALKINS, ESQ.

            800 17th Street, N.W.

5           Washington, D.C.   20006

6

7

8

    Also Present:

9

            Laura Verhees, Videotape Operator

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           You can put that away for now.

2           MS. CALKINS:  So you're saying you do

3   not want to go through this binder to determine if

4   anything is new.

5           MS. MELODY:  At this very moment, no.

6           MS. CALKINS:  Okay.

7           MS. MELODY:  But we will do that today.

8   BY MS. MELODY:

9       Q.   Dr. Vredenburgh, in 2008 you inspected

10  23 Post properties; is that correct?

11      A.   Sounds right without counting them.  I

12  can take the time to count them if you like.

13      Q.   Does it sound correct to you that you

14  inspected 23 Post properties?

15      A.   Roughly 23.  Again, I didn't memorize

16  the number.

17           But I have the binders and I can count

18  the number if you want me to go through and count

19  them.

20      Q.   Sure.  Why don't we mark your

21  affirmative report as an exhibit.

22           (Whereupon Vredenburgh Exhibit 1,

23           Evaluation of Post Properties, dated

24           July 31, 2013, was marked for

25           identification by the Certified

1                    Shorthand Reporter is attached

2                    hereto.)

3    BY MS. MELODY:

4          Q.    Dr. Vredenburgh, is the document that's

5    been marked Vredenburgh Exhibit 1 a copy of your

6    July 31, 2013 report in this case?

7          A.    Yes.

8          Q.    If I refer to this report as your

9    affirmative report, do you understand that this is

10   the document I'll be referring to?

11         A.    Yes.

12         Q.    Okay.  At the bottom of this page do

13   you see where it says,

14                    "In 2008 Vredenburgh and

15                    Associates reviewed floor plans

16                    for 23 Post properties in six

17                    states"?

18         A.    Yes.

19         Q.    Is the list on the following page the

20   list of 23 properties that you inspected in 2008?

21         A.    Yes.

22         Q.    In 2013 you inspected seven Post

23   properties; is that true?

24         A.    Yes.

25         Q.    And you understand that this case is

Page 19

1    observation of Dr. Zackowitz using that property;

2    is that correct?

3            A.    That's correct.

4            Q.    And it's not based on any measurement

5    data that you took?

6            A.    Correct.

7            Q.    It would be based on measurement data

8    that you reviewed?

9            A.    That I -- if you want to show me any

10   data, photographs that either your experts or the

11   Post experts have taken, as well as looking at the

12   floor plans, then I can make general opinions

13   about -- depending on what the issue is, which

14   types of people that they might be accessible to or

15   where there might be barriers that could be

16   problematic for various types of assistive devices.

17           Q.    Are you purporting to offer an

18   accessibility opinion in this case about all 50 of

19   the Post properties that are the subject of this

20   lawsuit?

21           A.    Yes.

22           Q.    You do not consider your ramp research

23   a standard, is that correct?

24           A.    Correct.

25           Q.    And you do not consider your kitchen

1    and bath research to constitute a standard; is that

2    correct?

3          A.    That's correct.

4          Q.    And you're not advocating any of the

5    Safe Harbors be revised based on your research; is

6    that correct?

7          A.    I did not do my research to change any

8    standards.

9                Based on Steinfeld's research, my

10   research and any other research, it's evident that

11   the Safe Harbors are not founded on research in

12   many instances, as Dr. Steinfeld himself says and

13   Pacquet, your expert -- or Bradtmiller, I mean.

14               He talks about that it is problematic.

15   They're based on basically a -- a study done in the

16   '70's by Dr. Steinfeld using 60 subjects.

17               So to the extent that the Safe Harbors

18   are founded on research that's relevant to devices

19   today, then they may be applicable; however,

20   they're certainly problematic in saying that they

21   guarantee or in any way certify that -- that the

22   Safe Harbors are going to give accessibility to

23   people with disabilities.

24         Q.    I understand that you have some

25   criticisms of the Safe Harbors.

1          But my question is you're not

2     advocating that any of the Safe Harbors be revised

3     based on your research; is that correct?

4          A.   Again, I advocate that all research

5     available, whether it's my research Dr. Steinfeld's

6     research, any other research that's being done, I

7     recommend that they be revised and updated.

8          If they want to use my research, I'm

9     not political.  I'm not going to fight to have the

10    Safe Harbors changed and employ my research.

11         However, they can certainly review my

12    research to see where there are perceptions of --

13    no differences as far as perceived ease of use of

14    various features from the Safe Harbors.  Because a

15    lot of these things haven't been tested before.

16         And the Safe Harbors are not founded on

17    research, because Dr. Steinfeld did not test at all

18    the different features of the Safe Harbors.

19         Q.   Have you ever submitted your research

20    to A.N.S.I.?

21         A.   No.  And I won't.

22         Like I said, I am not political and I'm

23    not trying to change standards.

24         If the standards body wishes to review

25    my research, they're welcome to do so, but I'm not

1    same format, did the same tests, same measurements.

2        Q.   Do you have a written protocol for

3    conducting your onsite inspections?

4        A.   We have a form we use that basically

5    outlines the protocol.  You have it here.  We

6    produced it.

7        Q.   Is it a one-page form?

8        A.   Yes.

9        Q.   Besides the one-page form, is there any

10   other written protocol that you have for conducting

11   onsite inspections?

12       A.   No.

13       Q.   In conducting onsite inspections in

14   this case you did not survey to the Fair Housing

15   guidelines; is that correct?

16       A.   Correct.

17       Q.   And you did not survey to any of the

18   Safe Harbors approved by the Department of Housing

19   and Urban Development; is that correct?

20       A.   Correct.

21       Q.   And you'll understand what I mean --

22   I'm going to refer to the United States Department

23   of Housing and Urban Development as H.U.D.  I think

24   that will make it easier.

25            Will you understand what I mean if I

Page 63

1   say H.U.D.?

2        A.    I will.

3        Q.    Okay.   In conducting your onsite

4   inspections for Post properties you didn't measure

5   to any state or local Building Code; is that true?

6        A.    True.

7        Q.    Is there any published standard that

8   you measured to during your onsite inspections of

9   Post properties?

10       A.    Not a standard.   I measured it to a

11  published study.

12       Q.    But no published standard containing

13  specifications, building specifications, true?

14            MS. CALKINS:   Objection.   Vague.

15            THE WITNESS:   I did not measure to a

16  published standard.   I measured to a published

17  study that addressed the published standards.

18  BY MS. MELODY:

19       Q.    Okay.   Is it correct that you did not

20  measure slopes during any of your onsite

21  inspections at Post properties?

22       A.    That is correct, I believe.

23       Q.    And you used a tape measure to measure

24  certain features within units; is that right?

25       A.    That's correct.

1                         (Whereupon Vredenburgh Exhibit 6,

2                         Inspection Sheet for Unit 409, was

3                         marked for identification by the

4                         Certified Shorthand Reporter is

5                         attached hereto.)

6       BY MS. MELODY:

7              Q.    Dr. Vredenburgh, the court reporter has

8       just handed you what's been marked deposition

9       Exhibit 6.

10             Is this an example of the one-page

11      sheet that you referenced as being what you used

12      during inspections?

13             A.    Yes.

14             Q.    Did your onsite inspections at Post

15      properties focus solely on kitchens, bathrooms and

16      environmental controls?

17             A.    That was the primary focus within a

18      unit.

19             Q.    And the -- this sheet would contain all

20      of the measurements that you took in a particular

21      unit; is that true?

22             A.    Right.  Sometimes it made sense to make

23      certain measurements depending on the configuration

24      and sometimes it didn't.

25             Q.    When does it not make sense to take a

1  measurement depending on the configuration?

2      A.   There's six feet to the side of it or

3  something like that, where there's so much clear

4  floor space that there's no question that there's

5  nothing on a side.

6          In other words, we're looking for the

7  amount of space, let's say, to the left and to the

8  right of something.  And left's say to the right

9  you encounter a cabinet and to the left it's open

10  for three feet, then there's no reason to write

11  down that number.

12      Q.   Is there a reason to write down that

13  it's obvious that there's a sufficient amount of

14  distance there?

15          Do you make some sort of a notation

16  about that?

17      A.   Sometimes I'll write "CFS," which means

18  clear floor space.

19      Q.   For features besides floor space, do

20  you make a notation when they're clearly in your

21  view accessible?

22      A.   We'll make a note if it's through a

23  closet and there's two doors -- we like two doors

24  to bathrooms.  And this is important, because

25  sometimes people have disabilities where they can

Page 68

1  use one side of their body or the other side.

2          So where there's -- the Safe Harbors

3  may consider something usable or accessible where,

4  let's say, you go into the door and then

5  everything's on the left, well, if a person doesn't

6  have use of the left side, if there's an another

7  door where they could go around and come in so that

8  it's on their right side, then that would be usable

9  to that specific person with that disability;

10  whereas with Safe Harbors may say if there's only

11  one door and it's usable to the left side, that

12  that would still be considered an accessible

13  bathroom.

14          Q.   Does this sheet that's been marred as

15  Exhibit 6 contain those sorts of evaluations when

16  you make them?

17          A.   Yes.   This one said two door.   If you

18  look at bathroom one, it says two doors through a

19  closet.   If it says two doors, then that means that

20  the person can use it on their left side or their

21  right side.

22          Q.   If a bathroom has two doors, does it

23  always mean that a person can use it --

24          A.   If they --

25          Q.   -- on the left side or right side?

1          A.     Because that means that they can flip

2    around.   They can come in -- they enter the

3    bathroom one way or they can enter the bathroom the

4    other way.   So that gives them more opportunity to

5    choose which way to enter the bathroom based on any

6    potential limitations that they may have.

7               So we consider it a really good feature

8    for somebody with disabilities if they are using a

9    wheelchair.

10         Q.     Does this sheet have a place to

11   measure -- measure door width?

12         A.     No.

13         Q.     Did you take door with -- width

14   measurements at Post properties?

15         A.     No.   I believe other people may have

16   done so.   We did the roll-through.

17               Occasionally there were problems with

18   door widths.   I don't believe on this property, but

19   some other property we were at once there was a

20   problem getting through doors, and we notated that.

21         Q.     But you're not offering in this case an

22   opinion about accessible door widths based on any

23   measurements you took; is that correct?

24               MS. CALKINS:   Objection.

25   Mischaracterizes testimony.

1          THE WITNESS:  We are not -- sometimes
2    we did take measures of door widths.
3          If she could not get through a door
4    width -- and again, I'm not sure if it was a Post
5    property.  There was no problem with doors on the
6    last seven properties that we went through or six
7    properties.  There may have been back in 2008 at a
8    property where there was a problem with door
9    widths.  And if there were, then we would have
10   notated that, we would have measured it, and then
11   we probably would have tested it with a walker,
12   too, to see if it was accessible if they used some
13   other assistive device than a wheelchair.
14        Q.   Where would you have noted an
15   inaccessible door width to a wheelchair user on
16   this form that's been marked Exhibit 6?
17        A.   On the bathroom.  It would have just
18   been a note saying door, cannot enter door, needed
19   to fold up chair.
20        When we fold a chair she always notated
21   folded chair.
22        Q.   I'm talking specifically about door
23   widths now, not necessarily the swing issue that
24   you've identified as a separate issue.
25        So you believe that if you found a door

1  width that was inaccessible to a person using a
2  wheelchair, you would have noted it on a form like
3  this?
4      A.   Yes.  It would have just been
5  handwritten on one side.
6      Q.   If you noted that problem --
7      A.   In the notes.  In the notes.
8      Q.   If you had noted that problem, would
9  you have made a recommendation in your report to
10 Post Properties regarding the door width of that
11 unit?
12     A.   Yes.
13     Q.   You did not record any measurements in
14 living rooms; is that correct?
15     A.   That's correct.
16     Q.   And you're not offering an opinion --
17     A.   Well, that's not correct.  Because
18 sometimes thermostats were measured -- in the
19 living rooms and we measured those.
20     Q.   Fair enough.
21          Thermostat aside, you did not measure
22 any switches in living rooms; is that correct?
23     A.   That is correct.
24     Q.   You did not measure any outlets in
25 living rooms; is that correct?

1        A.    Correct.

2        Q.    And you're not offering opinion about

3  switches or outlets located in living rooms; is

4  that true?

5        A.    I am giving generic opinions about

6  switches and outlets as far as that they can be

7  changed easily to be remote controlled.

8  Thermostats can also be raised or lowered.

9             I've spoken to the maintenance people,

10 and they pretty much consistently have a couple

11 feet extra of wire in the wall, and they said it's

12 easy to move thermostats if they want to be moved

13 or they can be replaced with a remote control, one.

14            For outlets, I've given a demonstration

15 several times where power strips can used.

16            The problem with outlets is even with

17 Safe Harbors they're not accessible to a lot of

18 people who use power chairs, because they typically

19 have a reach of four -- four inches or even less.

20 And so with a power strip they can put it exactly

21 where they can reach as opposed to an area where

22 even if it meets Safe Harbors, it's not going to be

23 usable to people with power chairs.

24       Q.    So if I understand your testimony, you

25 may offer an opinion about switches or outlets in

1  living rooms based on a generic opinion based on

2  your research, but you are not offering that

3  opinion based on data that you measured in this

4  case; is that correct?

5       A.    For living rooms correct.

6       Q.    And you did not record measurements in

7  bedrooms; is that true?

8       A.    That -- I believe that's true unless

9  there's a thermostat in there.

10       Q.    And you did not record measurements in

11  closets, correct?

12       A.    Correct.

13       Q.    You did not record measurements of

14  hallway widths?

15       A.    Correct.

16       Q.    You did not measure the height of

17  washing machines or clothes dryers, true?

18       A.    We tested them I think -- if we did

19  measurements, occasionally they would have been

20  notated if it was provided by the property.  A lot

21  of times the washer and dryer were tenant property

22  so we didn't measure them.

23       Q.    And if you measured a washing machine

24  or clothes dryer, would the measurement appear on

25  the one-page note that's Exhibit 6?

1          A.    Yes.   It would just be in the notes

2     part.

3          Q.    You didn't measure the widths of

4     parking spaces; is that right?

5          A.    That's correct.

6          Q.    And you didn't measure the slope or

7     level change on any route, true?

8          A.    True.

9          Q.    For kitchens, bathrooms and

10    environmental controls, you mentioned that --

11    strike that.

12          You earlier testified that depending on

13    if the clear floor space was obviously usable in

14    your opinion, you didn't measure it.

15          Were there features in kitchens,

16    bathrooms or environmental controls that you did

17    not measure in a unit?

18          A.    I don't understand your question.

19          Q.    Were there any case -- was there any

20    circumstance where you didn't measure all of the

21    features in a kitchen?

22          MS. CALKINS:   Objection.   Vague.

23          You're saying -- you're using the word

24    "measure" to mean measure with a measuring tape?

25          MS. MELODY:   We're talking about a

Page 75

1    measuring tape.

2            THE WITNESS:  Sometimes there's an

3    efficiency kitchen where everything's in one line

4    and there's nothing -- there's -- each feature is

5    lined up one after the next so you can roll from

6    one to the next, and there's no -- nothing facing

7    it or in any way a barrier to a wheelchair.  So we

8    would just put "CFS" for all the features.

9            If there's nothing -- we may measure

10   the distance between, let's say, the sink and the

11   center -- center sink to center dishwasher.  But

12   then I would have Ilene get in position, and I

13   would have her centered on each of the features to

14   show that her body can center, let's say, on the

15   sink with her reach straight out, so that I know

16   that she -- her body would be centered on the sink.

17       Q.   Was there ever an occasion where you

18   didn't measure the distance from -- where you

19   didn't measure the sink height, for example, in a

20   bathroom?

21       A.   Counter height?

22       Q.   Uh-huh.  Yes.

23            MS. CALKINS:  Again, measure it with a

24   measure tape?

25            THE WITNESS:  I think we measured it.

Page 76

1   We might have forgotten it in a place.  It might be

2   blank on one of the forms.

3   BY MS. MELODY:

4        Q.   Would there be circumstances where you

5   elected not to measure the distance from the toilet

6   to the barrier on the right?

7        A.   If there was no barrier on the right.

8   Sometimes the toilet's just got a huge empty area

9   next to it.

10       Q.   If there was a barrier on the right of

11  the toilet, would there be any reason for you to

12  omit to measure it?

13       A.   No.  We would -- it would be called

14  toilet right on the form.

15       Q.   Are you offering an opinion on the

16  accessibility of the common areas at Post

17  properties?

18       A.   Yes.

19       Q.   Do you understand what I mean by

20  "common areas"?

21       A.   Yes.

22       Q.   And you're offering opinion on the

23  accessibility of those areas; is that correct?

24       A.   Yes.

25       Q.   Is that opinion based on any

1         Q.   Yes.  107, please.  107, line 24.

2         A.   Okay.

3         Q.   If you could read page 107 line 24

4  through page 108 line 12, please.

5         A.   Okay.  I think we're talking about

6  thresholds here.  So,

7                       "Are you offering opinion in

8                       this case about the

9                       accessibility of public and

10                     common-use areas at Post?

11                     "Only to the extent if I'm

12                     asked, if you have a slope of

13                     this much and a cross slope of

14                     that much, is it accessible.

15                     Applying my slope research if

16                     it's -- for some reason there's

17                     Frost Heave relevant to the

18                     properties, I might talk about

19                     that, as well.  But as far as

20                     me, I didn't measure it."

21         Okay.  So you're talking about whether

22  I measured the slope and whether I am applying my

23  measurements.  And I'm saying no.  I'm applying my

24  research.

25         Q.   I'd like you to continue to read it.

1          It's not based on any of your

2    inspections, correct?  At Post properties, correct?

3          A.    Right.  So that's saying I didn't

4    measure the slope.  I'm applying my research for

5    the common areas.

6          Q.    But none of that is based on

7    measurements that you took, correct?

8          A.    Right.  It's not based on measurements.

9    It's based on the other evaluation that we did and

10   applying the research.

11         Q.    I understood that.

12         But I understood that your testimony

13   just now to be that you're offering an

14   accessibility opinion on the common areas based on

15   measurements you took.

16         Is that true?

17         MS. CALKINS:  What are you talking --

18   which properties are you talking about?

19         MS. MELODY:  I'm talking about the

20   properties in United States versus Post Properties,

21   50 properties and any that she inspected.

22         THE WITNESS:  We're talking about

23   correlation to the study.  So I'm responding just

24   about the slopes in this question and whether I'm

25   applying my research.  We're not talking about

1    kitchens and bathrooms.

2            I did evaluate kitchens and bathrooms

3    in the common areas at E.R.C. too.  But you can

4    tell from my response I'm specifically talking

5    about did I measure the slopes on the Post

6    properties back at the time that the E.R.C.

7    deposition was taken.

8            And obviously I understood it to be

9    asking am I giving opinion about any slopes that I

10   measured.  And I said, "No.  I'm giving an opinion

11   based on other people's measurements."

12           If you say there is a slope about this

13   much, then I can apply my research.  But I'm not

14   saying I didn't evaluate kitchens and bathrooms in

15   common areas and things like that.

16   BY MS. MELODY:

17       Q.   And so you understand your testimony

18   today that you did -- you understood your testimony

19   to be that you did apply your measurements that you

20   took to your accessibility evaluation; is that

21   correct?

22       A.   What I said is I did not do slope

23   measurements on the properties.

24           But if you gave me a measurement, I

25   could then apply my research.

1       A.    It does not.

2       Q.    Okay.  Dr. Zackowitz accompanied you on

3  your inspection of Post properties in this case; is

4  that correct?

5       A.    Yes.

6       Q.    Did she accompany you on every

7  inspection of a Post property?

8       A.    Yes.

9       Q.    And you have described Dr. Zackowitz's

10  role during inspections as testing.  Is that true?

11            MS. CALKINS:  Objection.

12  Mischaracterizes her testimony.

13            THE WITNESS:  Dr. Zackowitz plus the

14  wheelchair that she was sitting in were used to

15  evaluate her ability to move a wheelchair through

16  the property without encountering -- encountering

17  barriers and to be able to center on features of

18  the kitchens and bathrooms or other common area

19  features.

20  BY MS. MELODY:

21       Q.    And you've described that process that

22  you've just described as testing in your report in

23  this case; is that correct?

24       A.    Testing or evaluating, yes.

25       Q.    What are your instructions to

1 Dr. Zackowitz on what to do when she's testing a
2 kitchen?

3         A.    Well, the instructions were given years
4 ago, because we have been doing the same thing for
5 many years.  But we go through each appliance.
6 And -- you observed it.

7              So she moves through the -- rolls into
8 the kitchen, through the kitchen.  I then
9 photograph her at each appliance.  If she hits a
10 barrier, let's say that a refrigerator is hinged
11 such that she can't get into it, then we'd make a
12 note of that.  Then we move through the kitchen and
13 make sure that she can use each of the appliances
14 and center on them.

15             I take a picture showing her in
16 position, centering on and using each of the
17 features of the room, the bathroom or the kitchen.

18             If she can't close the bathroom door
19 when she rolls in, then I make a note of that.  If
20 she can't get to something, if there's some barrier
21 there that's -- construction barrier, then I would
22 make a note of that.

23             If she can't get there because there's
24 an object of -- a possession of the resident such
25 that she needs to fold up the chair to get in, we

1   also made a note of that.  That's obviously not a

2   construction issue, but if she gets out of the

3   chair and folds it up to get into a room, we make a

4   note of that, as well.

5          Q.    Is your opinion with respect to testing

6   or evaluating that Dr. Zackowitz does restricted to

7   kitchens and bathrooms?

8          A.    No.  She is also evaluating

9   thermostats, washers, dryers, common areas.

10         Q.    And in describing Dr. Zackowitz's

11  testing of the kitchen, you just use the terms,

12  quote, center on and, quote, use.

13                Are those two things different?

14         A.    Yes.

15         Q.    How are they different?

16         A.    You might be able to center on

17  something but not be able -- let's say you center

18  on an oven.  But if you can't get the door open,

19  you can't use it.  Even though you can center on

20  it, then you can use the stove, but you can't use

21  the oven.

22                So she has to be able to open the oven,

23  as well.  So there needs to be a place to position

24  the wheelchair such that she can open the oven not

25  just center on it.  Same with a dishwasher.

Page 154

1    Whereas let's say using a sink it's important that

2    she can center on it.  So I have her put her arm

3    out so that I can see that she reaches straight to

4    the controls.

5              If she had to reach forward or

6    backwards to turn on -- to turn on the faucet and

7    couldn't go straight out, then that's not centering

8    on it.

9              I make sure I take a picture of her

10   centering on it.

11        Q.   She, Dr. Zackowitz, does not test every

12   feature in the kitchen; is that correct?

13        A.   She has not checked doing the outlets

14   or switches, if that's what you're referring to.

15   She tests all the centering on all the appliances,

16   and then we generically address light switches and

17   outlets.

18        Q.   Dr. Zackowitz does not turn the kitchen

19   sink on during her testing; is that correct?

20        A.   Correct.  I'm not evaluating

21   Dr. Zackowitz's abilities.  This isn't about her

22   capabilities and limitations.  This is about her

23   being able to center on the faucet.

24              So if she reaches her arm straight and

25   can reach the knobs of the faucet, then that shows

1    that she can center on it.  But I don't know if

2    person X can actually brush their teeth or use that

3    side.

4            So it's not about whether she can do

5    it.  It's just whether she's centered on the -- the

6    sink.

7        Q.    So if Dr. Zackowitz were a mannequin

8    sitting in a chair, the demonstration would be the

9    same, in your mind?

10       A.    Only if the mannequin can extend its

11   arm out straight.

12       Q.    But if we're not testing

13   Dr. Zackowitz's ability to touch the facet, why

14   does it matter that she can extent her arm and

15   touch the faucet?

16       A.    Because if she can't reach her arm

17   straight and touch the faucet, then she's not

18   centered.  If her arm's over here to touch the

19   faucet or way back here, she's not centered on it.

20           I want her arm out straight and be able

21   to grasp the knob.

22           Now, granted, not everyone's going to

23   be able to grasp and turn on a knob on a sink, but

24   I want to know that if somebody has the capability

25   to reach their arm out and -- and turn the knob on,

1   that they can without reaching forward or having to

2   reach back.  She has to be able to center on it.

3        Q.   You don't instruct Dr. Zackowitz to

4   test whether she can put both of her hands and

5   under the kitchen faucet; is that correct?

6        A.   Right.  Because that's not -- that's an

7   individual difference as far as capabilities,

8   limitations.  That has nothing to do with the

9   usability of the faucet.  That has to do with the

10  person's disability.

11            And so that's not what -- that would be

12  very individual for each person that moves in.

13            And there may be some people that can't

14  do that because they don't have use of both hands.

15  But that -- they wouldn't be able to use the Safe

16  Harbors kitchen or any other design except for

17  maybe using the methodology that I'm talking about.

18            If a remedy has been determined to be

19  needed, Safe Harbors aren't going to work.  And

20  building it to Safe Harbors wouldn't work.

21            In that case, if you can't use both

22  hands, they may need some kind of bump-out sink or

23  some kind of sink that they can get where it comes

24  towards them with a sensor on it.

25            If they can -- if they can -- let's say

1   they have a four-inch reach, which is some people,

2   that's what they may need.  And they're not going

3   to be able to use a sink that's for Safe Harbors or

4   a sink that's consistent with our research.

5   They're going to need something tailored to their

6   very unique needs.

7           Q.   I understand.

8                I think my question was more limited,

9   which is just that you do not instruct

10  Dr. Zackowitz to demonstrate that she can put both

11  hands under the kitchen sink; is that correct?

12          A.   No.  I'm not testing her abilities.

13  I'm testing positioning of the chair and her body.

14          Q.   And you likewise don't test whether

15  Dr. Zackowitz can rinse a dish in the sink; is that

16  right?

17          A.   No.  Again, I'm not testing what she's

18  capable of doing.

19          Q.   And you don't test whether she's able

20  to load a dish into the dishwasher?

21          A.   We do have her open a dishwasher to

22  make sure there's ample space for her to open a

23  dishwasher and pull the racks out.

24               But whether or not someone has the

25  ability to grasp a dish and put it in a dishwasher,

1   that again is capabilities and limitations of the

2   individual.  They have to be able to maneuver the

3   chair to have the floor space to operate the

4   dishwasher.

5           But then whether somebody has their

6   individual differences, again, I'm not testing

7   Dr. Zackowitz.  She doesn't have a disability, and

8   I'm not indicating that she does.  And I'm not

9   evaluating her capabilities.

10          We are looking at whether anybody in a

11  wheelchair, in a manual wheelchair, can use a

12  dishwasher and position their chair to use it; not

13  whether person X can.  Because each person --

14          There is no one disability.  Every

15  single person that has a disability is different as

16  far as whether they have use of one hand or two

17  hands.  If they can only use one hand or reach four

18  inches, they may not be able to grasp a big pan and

19  put it in a dishwasher.  But that has no nothing to

20  do with the construction of the facility.

21          Q.   Why use a person at all in the chair

22  and not just use a ruler or a yardstick to

23  establish where the chair is centered on?

24          A.   Because that doesn't tell the whole

25  picture.  A ruler or yardstick doesn't show --

1    as usability for other people.  But what's
2    important is that she can center her body on the
3    sink, because that would show that anybody in a
4    standard size wheelchair would be able to center
5    their body on the sink.
6              Q.   So am I correct in understanding that
7    your opinion in this case related to
8    Dr. Zackowitz's testing or evaluation is that her
9    test or evaluation show whether someone is able to
10   center on a feature?
11             A.   Or open it, use it, operate it and --
12   and sinks, yes, centering for sinks, that would be
13   true.  They have to be able to open a dishwasher.
14   They have to be able to open the stove, open the
15   refrigerator to get inside all those features.  If
16   they can't, then they're not usable.
17             Q.   Is a sink usable if you can't brush
18   your teeth in it?
19             A.   There's people that can't brush their
20   teeth though they can center on it.
21                  I don't know if they can grasp the
22   knob, but that's a part of their disability that
23   they're not going to be able to with Safe Harbors
24   either.  They're going to need a unique
25   construction to tailor to their own specific needs

1    in some cases that neither the Safe Harbors are --

2    is going to accommodate.

3            There are disabilities that -- that go

4    beyond anything that any standard can do that's

5    going to need to be tailored to the user.

6        Q.   So because of that, in your view would

7    it be impossible to say whether any particular sink

8    was accessible and usable to people with

9    disabilities generally?

10           MS. CALKINS:  Objection.  Vague.

11           THE WITNESS:  Sink design.  All -- what

12   we're looking at is can you center on the sink

13   based on the configuration of the room.

14           And that's why I'm saying that it's

15   more important to have a contractor -- or, I mean,

16   excuse me, the maintenance person can switch the

17   sink to a wall hung if they need that.  They may

18   need one -- sometimes there's an extended bowl,

19   there's sensors, there's various things that can be

20   used by people with disabilities if they can't use

21   a typical sink design with a vanity.

22   BY MS. MELODY:

23       Q.   And my question is when you were

24   testing or evaluating Post properties using

25   Dr. Zackowitz, what you're measuring is whether

Page 164

1    Dr. Zackowitz can center on the sink, correct?

2         A.    Yes.

3         Q.    You're not measuring whether she can

4    use the sink?

5         A.    Correct.

6         Q.    And when you measure kitchens, using

7    Dr. Zackowitz to test or evaluate the kitchen,

8    you're testing whether Dr. Zackowitz can center on

9    the sink; not whether she can use the sink?

10             MS. CALKINS:  Objection.  Vague and

11   convoluted.

12             You're using different definitions.

13             THE WITNESS:  Well, if you can center

14   on the sink, theoretically you can use the sink

15   unless you don't have the capability to use the

16   sink.

17             But then Safe Harbors is not going to

18   help the person if -- what we're doing is making

19   sure that a person in a wheelchair can center on

20   the sink and reach the controls assuming that they

21   have the ability to put their arm out and reach the

22   control.

23             If they have, let's say, a four-inch

24   reach, which is not uncommon for a power chair,

25   then they're not going to be able to use the

# Vredenburgh & Associates, Inc.
## Human Factors, Ergonomics, Safety and Organizational Consulting

*Mailing Address*
2588 El Camino Real, F353
Carlsbad, CA 92008
(760) 434-4741
*Fax:* (760) 434-6089
Avredenburgh@gmail.com
www.hfexpert.com

October 28, 2013

Lynn Calkins, Esq.
Holland & Knight
800 17th Street NW
Washington, DC 20006

Re: USA vs. Post Properties

After reviewing my testimony in the USA vs. Post Properties matter taken on October 15, 2013, I found several errors in the transcript:

Page 17, line 15: "didn't" should read "isn't"
Page 48, line 9 to line 11: delete "But I am . . . went to."
Page 48, line 20: delete "At the . . . but"
Page 53, line 20: "neat" should read "need"
Page 60, line 1: "1-D" should read "1-B"
Page 97, line 16: "various zone front" is not what I said. However, at this time, I do not recall what I said.
Page 97, line 18: "inefficiency" should read "an efficiency"
Page 119, line 10: "the problem" should read "power"
Page 138, line 13: "Yes" should read "No. Rose did."
Page 139, line 24: "arranged" should read "a range"
Page 161, line 23: "minding" should read "miming"
Page 172, line 7: should read "she's not testing, but"
Page 172, line 8: "or" should be deleted
Page 243, line 15: "this is scrolls" is not what I said. However, at this time, I do not recall what I said.
Page 249, line 25: "reviewed" should read "interviewed"
Page 263, line 19: "would just did" should read "do"
Page 283, line 16: "were" should read "would"
Page 289, line 11: delete "he"

Page 292, line 22: "lost" should read "lots"

Page 321, lines 10-11: Should read "It's in the property specific reports. It's not in the main report."

Page 321, line 18: "don't" should be deleted

Page 351, line 4: "six" should read "sixty"

Page 360, line 4: "available" should read "aware of"

Page 362, lines 11-16: should read "...which approach should be used. One approach is the Safe harbors. The person who did the principal research says they are not very reliable or valid at this point. A method that actually accommodates real people with real disabilities, that I recommend if there is a remedy needed, is to..."

Page 428, line 6-7: "the indication" should read "his opinion"

I appreciate the opportunity to assist you in this case and am available for any additional work that may be required. If I may be of further assistance please feel free to call me.

Sincerely,

Alison G. Vredenburgh, Ph.D., CPE
Vredenburgh & Associates, Inc.

AGV/iz