# United States' Exhibit 11

*United States v. Post Properties, Inc., et al.*

Civil Action No. 10-1866 (RJL)

1          IN THE UNITED STATES DISTRICT COURT

2                DISTRICT OF COLUMBIA

3

4   UNITED STATES OF AMERICA,

5          Plaintiffs,

6   vs.                              NO. 10-1866 (RJL)

7   POST PROPERTIES, INC.,

    et al.,

8

9          Defendants.

    _____/

10

11

12

13

14          DEPOSITION OF PAUL S. SHERIFF

15             SAN FRANCISCO, CALIFORNIA

16            THURSDAY, OCTOBER 17, 2013

17

18

19

20

21   BY:  ANDREA M. IGNACIO HOWARD, CSR, RPR, CCRR, CLR

22        CSR LICENSE NO. 9830

23        JOB NO. 66773

24

25

1          SAN FRANCISCO, CALIFORNIA

2          THURSDAY, OCTOBER 17, 2013

3               9:24 a.m.

4

5

6

7

8      Deposition of PAUL STANLEY SHERIFF,

9   taken at HOLLAND & KNIGHT, 50 California

10   Street, 28th Floor, San Francisco, California,

11   pursuant to Notice, before me, ANDREA M.

12   IGNACIO, CSR, RPR, CCRR, CLR ~ CSR License

13   No. 9830.

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1    A P P E A R A N C E S:

2

3

4        FOR PLAINTIFFS:

5        U.S. DEPARTMENT OF JUSTICE

6        CIVIL RIGHTS DIVISION

7        By:   PAMELA BARRON, Esq.

8              COLLEEN MELODY, Esq.

9              SHARON KEARNS JAMISON, Esq.

10       1800 G Street, N.W.

11       Washington, D.C. 20006

12

13

14

15

16       FOR DEFENDANTS:

17       HOLLAND & KNIGHT

18       By:   RAFE PETERSEN, Esq.

19       2099 Pennsylvania Avenue, N.W.

20       Washington, D.C. 20006

21

22

23

24                    ---oOo---

25

1      A    This does not represent the list of findings.

2    It represents whether the requirement was fulfilled or

3    not.

4      Q    We're going to talk about that.

5      A    Okay.

6      Q    So this chart applies to 30 properties that

7    you reviewed for Post.

8           Did you review those in 2008?

9      A    Yes.

10     Q    And I'm going to name those properties for

11   the record, and you can tell me if this is correct.

12          Abbey?

13     A    Yes.

14     Q    And that's A-B-B-E-Y.

15          Addison Roe?

16          And that's A-D-D-I-S-O-N, R-O-E.

17     A    Correct.

18     Q    Alexander?

19     A    Correct.

20     Q    Biltmore?

21     A    Correct.

22     Q    Briarcliff?

23     A    Correct.

24     Q    Brook Haven?

25     A    Correct.

1   Q   Carlisle?

2   A   Correct.

3   Q   Crest?

4   A   Correct.

5   Q   Crossing?

6   A   Correct.

7   Q   Dunwoody?

8   A   Correct.

9   Q   Gardens?

10   A   Correct.

11   Q   Glen?

12   A   Correct.

13   Q   Heights?

14   A   Correct.

15   Q   Lenox Park?

16   A   Correct.

17   Q   Legacy?

18   A   Correct.

19   Q   Lindbergh?

20   A   Yes, correct.

21   Q   Massachusetts Avenue?

22   A   Correct.

23   Q   Mercer Square?

24   A   Correct.

25   Q   Oglethorpe?

1      A      Correct.

2      Q      Peachtree Hills?

3      A      Correct.

4      Q      Pentagon Row?

5      A      Correct.

6      Q      Renaissance?

7      A      Correct.

8      Q      Ridge?

9      A      Correct.

10     Q      Riverside?

11     A      Correct.

12     Q      Spring?

13     A      Correct.

14     Q      Square?

15     A      Correct.

16     Q      Stratford?

17     A      Correct.

18     Q      Uptown Village?

19     A      Correct.

20     Q      Vineyard?

21     A      Correct.

22     Q      Worthington?

23     A      Correct.

24     Q      Now, in your 2013 report you stated that you

25     inspected 31 properties.

1          Which one was the 31st?

2          Was that Luminaria?

3     A    Luminaria and Toscana.

4     Q    Okay.  So that's 32.

5          Now, Luminaria and Toscana --

6     A    New York, New York.

7     Q    New York.

8     A    See, I think where we're getting confused

9     here is Abbey and Worthington are the same property.

10    Q    Now, Worthington, doesn't that belong to the

11    company now?

12         THE WITNESS:  Is it Worthington?

13         MR. PETERSEN:  Yeah -- no, it doesn't.

14         Yeah, you inspected -- those are listed in

15    the video as the same property.

16         THE WITNESS:  Right..

17         MS. BARRON:  Okay.  Then let's --

18         MR. PETERSEN:  Abbey and Worthington are

19    listed as one property elsewhere.

20         MS. BARRON:  Are they -- are they the same

21    property, or are they separate properties, just on the

22    same video?

23         MR. PETERSEN:  No, they share a leasing

24    center.  They share --

25         THE WITNESS:  The common areas.

1        MR. PETERSEN:  It's two buildings that are

2    together.

3        MS. BARRON:  Q.  Now, when did you inspect

4    Luminaria?

5        Was that also in 2008?

6    A    Correct.

7    Q    And Toscana was in 2008?

8    A    Correct.

9    Q    And why were Luminaria and Toscana not in

10   your report?

11   A    That's a very good question.  They're in the

12   master report.  Talk about it on page -- I have a list

13   of all those that we went to on page 88.

14   Q    Now, is that of the 2013 report?

15   A    No, that's on the '08 report, page PS-D-88.

16   Q    Okay.  But those two properties did not make

17   it onto this chart at PS-D-93; is that correct?

18   A    That is correct.

19   Q    Okay.  Let's look at Luminaria.

20       How did you determine which units to visit at

21   Luminaria?

22   A    We determined the units at Luminaria like we

23   determined all the units.  We -- we're assigned that

24   facility to be one of those that we would provide the

25   roll-through usability and accessibility examination.

1    There's a -- the number of units that we try to visit

2    is driven by how broad the unit types are, how

3    different the unit types are.

4          If they only have three unit types, then we

5    would only do the three unit types.

6    Q    One of each or --

7    A    One of each.

8          And if they had eight different unit types,

9    we would try to do the eight different unit types.

10   Q    One of each?

11   A    One of each.

12         Sometimes a unit would have the same

13   configuration of another unit, but it might have a

14   patio on it.  So instead of doing the one unit without

15   a patio and then doing the unit with the patio that's

16   identical except for the patio, we would do the unit

17   that has the -- both.

18   Q    Got you.

19         Now, in -- in Luminaria, I would submit that

20   there were 11 unit types, and I think you were able to

21   survey five of the units.

22         Would you like to -- could we look at the

23   video?

24         I'd like to go through it with you for

25   Luminaria.

1         I'm sorry.  I misunderstood that video.  Can

2    we roll it back.

3         What room is that?

4    A    Well, we're going to find out.

5    Q    Okay.  All right.

6         So that is a bathroom?

7    A    Uh-huh.

8    Q    Is there only one bathroom in this unit?

9    A    I'm not sure.

10   Q    Okay.  We'll look and see.

11        Now, in this bathroom you did not close the

12   ' door?

13   A    Well, we're going to -- that's just -- I'm

14   not sure I've seen the whole video.

15   Q    Okay.  Let's -- if we need to look at it, we

16   will.

17        MR. PETERSEN:  That was the laundry room.

18        MS. BARRON:  I couldn't tell.  I could see

19   the lights.

20        That's a laundry room?

21        MR. PETERSEN:  No, what he was just in was

22   the laundry room.

23        THE WITNESS:  There's the bathroom.

24        MS. BARRON:  Oh, okay.

25        THE WITNESS:  This is the figure of the

1    A    Yep, correct, maneuvering about the space.

2         30-by-48-inch clear floor space at the range

3    and sink.

4    Q    It's just another view of the same features?

5    A    Yeah, correct.

6    Q    What is the turning radius for your chair?

7    A    Turning radius for my chair?

8    Q    For the tool chair.

9    A    I'd have to look it up.  We -- we've marked

10   it.

11        That's a different angle than the other one.

12   That's a different angle than the other one.

13        Closet.

14   Q    That time I could tell it was a laundry.

15   A    See, there's no furniture.  There's...

16   Q    Now, I don't see you in these shots.

17        Is that blank video?

18   A    What's that?

19   Q    I don't see you in these shots.

20        Is that -- is that blank video?

21        MS. BARRON:  Do you want to go back just a

22   smidge so we can look at the -- is it 9 -- I just want

23   to go back to, like, 9:15.

24        MS. JAMISON:  I know.

25        MS. BARRON:  Yeah.

1    Q    What does this show?

2    A    Oh, that's a shot of the bathroom itself.

3    Q    But it's not showing you in it, using it?

4    A    That is correct.

5    Q    What does that mean?  Is that --

6    A    That means that that door must be re-hinged.

7    Q    Does that mean that it's inaccessible the way

8  it is right now?

9    A    That's correct.  It would be accessible or

10  usable if you re-hinge the door.

11        And that itself is the bathroom layout.

12    Q    Okay.

13    A    And here is -- may I?

14    Q    Yes, please.

15    A    If we back it up a bit to the figure.

16    Q    The drawing?

17    A    Yes.

18        MS. JAMISON:  Let's see.  That's too far.

19  Let's see.  Back up to the figure for the bathroom?

20        MS. BARRON:  Could you go forward a little

21  bit, about 9:15.

22        MS. JAMISON:  Okay.

23        MS. BARRON:  Q.  Did we get the figure?

24    A    It's this way.  It's my -- the blue thing has

25  got to come my way a bit.  We're close.

1    Q    Just a smidge more.

2    A    Now --

3    Q    If we run it from here, will we get it?

4    A    Yeah.

5         MS. JAMISON:   Yeah.

6         THE WITNESS:   Okay.   Stop.

7         Now, the way you can tell that this is an

8    adaptable unit is -- see where the door swings in?

9         MS. BARRON:   Okay.

10        THE WITNESS:   Okay.   That's a 210 door or

11   34 inches.

12        MS. BARRON:   210.   All right.   I'm looking

13   here.

14   Q    34-inch door?

15   A    Okay.   So you know if you swing the door out

16   against that closet, right, from here to there, you're

17   going to have your 30-by-48-inch clear floor space.

18   Q    Which you don't have right now?

19   A    Correct.

20   Q    Okay.   Let's keep running it.

21   A    So that's how you know that that is

22   adaptable.

23   Q    By looking at the floor plan?

24   A    That's correct.

25   Q    Now, you know that if you swing the door out,

1    you're not going to run into a hallway or something

2    else?

3        A    No, because what's going to happen here is

4    this will be your -- this is what's there.  And if you

5    look back at the video, there is no wall line or

6    anything in this area.

7        Q    Okay.

8        A    This is -- remember when I said there was no

9    furniture there?  That's along the wall that was over

10   here.

11       Q    Okay.  Let's keep going.

12       A    See how that door swings in?

13       Q    Yes.

14       A    It's just that there was more space.

15       Q    Right now, you cannot close it?

16       A    Correct.

17       Q    Okay.

18       A    But if you re-hinged it to swing the other

19   way, you could close it.

20       Q    Okay.  So we agree that right now, it's not

21   accessible or usable, but you're saying you could

22   adapt it?

23       A    You could adapt it, and by --

24       Q    Okay.  In your opinion?

25       A    Yes.

1     A    Correct.

2     Q    15E.

3          MS. BARRON:  And pause, please, Sharon.

4          THE WITNESS:  Okay.  So this would be the

5     entire floor plan for that unit.

6          MS. BARRON:  Okay.  May we go off the record

7     for a moment?

8          (Recess taken.)

9          MS. BARRON:  Now we're back on the record.

10    Q    And we are at apartment 15E, and Mr. Sheriff

11    is just explaining this floor plan.

12         Mr. Sheriff, do you want to tell us again

13    where we are?

14    A    This is the floor plan for the unit we are

15    about to enter.

16    Q    Okay.  And we'll stop the video.

17         What is this floor plan?

18         Is this -- what layout is this?

19    A    That's the floor plan of the kitchen.

20    Q    Of the kitchen; okay.

21         Take a look at that.

22         That's a U-shaped kitchen; is that correct?

23    A    That is a U-shaped kitchen.

24    Q    Okay.

25    A    Maneuvering about the space to all of the

1      A    That is correct.

2      Q    So now, you did not access this balcony?

3      A    That is correct.

4      Q    Okay.  So is that an inaccessible element?

5      A    That's an element that's not usable as it

6    sits.

7      Q    So I would submit that this is a step in

8    threshold of about 11 inches to a balcony.

9           Is this a design and construction issue?

10     A    Is there another route to it?

11     Q    From the room -- this is interior.  This is

12   the dwelling unit.

13     A    That would be a design and construction

14   issue, yes.

15     Q    Okay.  So it would not be a punch list item?

16     A    That is correct.

17     Q    So now, is this item listed anywhere in your

18   report?

19     A    Right here.

20     Q    Okay.  In the video.  All right.  Thank you.

21          Okay.  We can keep rolling.

22          Do you know how many times this particular

23   design and construction issue occurred in Luminaria?

24     A    No, I do not.

25     Q    Okay.  How about at any other Post

1    Properties?

2        A    Well, not that one particularly.

3        Q    How about a different Post property, like

4    Massachusetts Avenue?

5        A    Do we have the Massachusetts Ave video?

6        Q    We do.

7        A    Okay.

8        Q    So have you made a list of any of the

9    properties and units where that condition occurred?

10       A    We have mentioned various issues throughout

11   our written reports.

12       Q    This particular issue?

13       A    Issues of non-accessibility.

14       Q    But this particular issue, do you know if

15   this is in your report?

16       A    I -- I would have to go back through all the

17   reports.

18       Q    Okay.

19       A    But the video clearly shows that that's

20   there.

21       Q    So the way to find the compilation of these

22   types of issues would be to watch the videos?

23       A    Correct.

24       Q    It's hundreds of minutes of videos?

25       A    Well, I know there's hundreds of minutes of

1    videos.

2        Q    Okay.  So now, are we on unit 5C?

3             I think there is a shot of the door.

4             MS. BARRON:  You might have to back up a

5    smidge.

6        Q    Okay.  Unit 5C.

7             And let's stop here.  What --

8        A    That would be the floor plan layout.

9        Q    Okay.  All right.

10            Any issue with that threshold?  Mr. Sheriff,

11   any issue with that threshold?

12       A    Not that I could observe.

13       Q    Okay.  Keep going.

14            So this is another U-shaped kitchen?

15       A    Well, let's -- we can tell by the video, but

16   that was the diagram --

17       Q    Okay.

18       A    -- of the kitchen.

19       Q    Okay.

20       A    This doesn't appear to be a U-shaped kitchen,

21   but I can't tell yet because I think the back wall has

22   no appliances.

23       Q    Okay.

24       A    But I -- yeah, see --

25       Q    Okay.

1          In 2013 you did not inspect any Post

2     Properties?

3          A     Correct.

4          Q     So do you understand that there are

5     50 properties that are subject to this lawsuit?

6          A     Yes.

7          Q     So you have not inspected about

8     19 properties, is that correct, doing the math?

9          A     Well, 31 minus -- 50 minus 31 would be 19.

10         Q     Okay.  So there are about 19 properties.

11               So for example, you have not inspected

12    Post Collier Hills in Atlanta?

13         A     No.

14         Q     Okay.  It's not on the chart.

15               And you have not inspected Post Harbour Place

16    City Homes in Tampa?

17         A     No.

18         Q     And you have not inspected Post Midtown

19    Square in Houston?

20         A     Not that I know of.

21         Q     Okay.  So there are a number of properties

22    then, those 19 properties, that you did not inspect?

23         A     That is correct.

24         Q     Okay.  So you have no measurement data for

25    the Post Properties that you did not inspect?

1       A    I have no data at all for the Post Properties

2   that I did not inspect.

3       Q    So you're not offering any accessibility

4   opinion for the Post Properties that you did not

5   inspect; is that correct?

6       A    That is correct.

7       Q    Okay.  And I'm correct that you have no

8   opinion about the accessibility of the common areas or

9   the units of the Post Properties that you did not

10  inspect?

11      A    That is correct.

12      Q    Okay.  And I'm correct that you have no

13  opinion about the accessibility of any public

14  accommodations for the Post Properties that you did

15  not inspect?

16      A    That is correct.

17      Q    Okay.

18      A    If I had not been on a property, it would be

19  irresponsible to render an opinion.

20      Q    Okay.  Thank you.

21          Now, you were not measuring to compare

22  against LCM's measurements; is that correct?

23          MR. PETERSEN:  Objection.

24          THE WITNESS:  LCM was never on this case when

25  we did our work.

Page 68

1          THE WITNESS:  Please.

2          (Recess taken.)

3          MS. BARRON:  Q.  So you are not offering an

4    opinion about the accuracy of LCM's measurements?

5     A    No, I'm not offering --

6     Q    Okay.  You -- and you're not --

7     A    -- an opinion.

8     Q    -- you're not offering an opinion about the

9    accuracy of Peter Stratton's measurements?

10    A    Correct.

11    Q    And you're not offering an opinion about the

12   accuracy of Phil Zook's measurements?

13    A    I --

14    Q    Just the accuracy of the measurements.

15    A    I don't have an issue with Phil -- Phil

16   Zook's work.

17    Q    Okay.

18    A    Okay.

19    Q    So you don't have an opinion about the

20   accuracy of his measurements?

21    A    No.

22    Q    You're not going to attest to the accuracy of

23   his measurements?

24    A    No, I am not.

25    Q    Okay.  How did you choose which Post

1      A    Give me the schedule.  Let's coordinate this.

2    These are the properties I want you to see.

3      Q    So did you ask for an opportunity to inspect

4    all 50?

5      A    No.

6      Q    So we talked about for these inspections how

7    you chose which units to inspect, and I think we

8    talked about that.

9           Why was it important to identify unit types?

10     A    It was important to identify unit types to

11   get a cross-section of the unit types available so we

12   could get a good analysis of the usability,

13   adaptability and accessibility of the -- of the sites

14   and the dwelling units.

15     Q    And am I correct that you used marketing

16   floor plans and architectural plans to -- to determine

17   those types -- to determine unit types?

18     A    We did not review any architectural

19   blueprints.

20     Q    Okay.  And I think we already covered -- it

21   was not -- you did not inspect one of each unit type

22   during your inspections?

23     A    That is correct.  It was a random sampling.

24     Q    Okay.  Now, when you say "a random sampling,"

25   was that actually done in some statistical way, or are

1    the Department of Justice?

2         A    Thank God.

3         Q    Thank God that they're mandatory?

4         A    Thank God that they're mandatory and

5    promulgated.

6         Q    And so you agree that the ADA standard or the

7    ADAAG is mandatory for the public use areas at those

8    properties?

9         A    If there was a public accommodation action

10   going on at those properties.  Some of the properties

11   when I was there had off-site leasing offices.

12        Q    Okay.  So did your inspections in this case

13   evaluate the public use areas at Post Properties for

14   compliance with the ADA standard?

15        A    We rolled through those public areas, yes.

16   There were, yes.

17        Q    Now, did you use a measuring tape in those

18   areas?

19        A    We did not use a measuring tape.

20        Q    Did you use a digital level in those areas?

21        A    We did not use a digital level.

22        Q    Did you set forth any measurements on a paper

23   report about those accommodations?

24        A    No, we did not.

25        Q    Okay.  Now, you would agree that the ADA

1    Q    Do any stand-alone safe harbors allow

2   54 inches?

3        MR. PETERSEN:  Objection; vague.

4        MS. BARRON:  Q.  Well, a stand-alone safe

5   harbor would be one of the ten safe harbors that HUD

6   has approved.

7    A    There is a 54-inch in one of the safe

8   harbors, I believe.

9    Q    And a stand-alone safe harbor, would you say

10  maybe, if you were using ANSI '86 as your --

11   A    Yeah, yeah, yes, yes.

12   Q    So for the ten HUD-approved safe harbors,

13  would you agree that the ten HUD-approved safe harbors

14  use 48?

15   A    Yes, the ten -- that's what they use.

16        Those ten safe harbors are not mandatory.

17  You must remember that.

18   Q    Understood.  Okay.

19        Now, we talked about the fact that your

20  methodology is not using the digital level.  It's not

21  using the measuring tape; is that correct?

22   A    That's correct.

23   Q    And you used your custom-designed chair and

24  the dimensions of your body; is that correct?

25   A    May I clarify?

1      Q    Of course.

2      A    I -- we used the dimensions of my body

3  associated with the chair.

4      Q    Right.

5      A    And how we've done that is we've taken all of

6  the Steinfeld research --

7      Q    What I want to --

8      A    -- and then -- no, no.  Let me finish,

9  please.  I want to make this perfectly clear --

10     Q    Okay.

11     A    -- so there is no more confusion, because

12  we've gone through this ground before.

13     Q    I didn't want you to have to go through it.

14     A    Well, I would like to; okay?

15     Q    Okay.

16     A    You have to remember that, when we built this

17  measuring tool, and when I am out there doing this, it

18  is not me.  This is the tool; okay?

19          And if you look at Figures 3 and 3A and

20  whatever, and then you look at me superimposed on

21  that, I am -- I match them perfectly.

22     Q    What I want to ask is:  When you used your

23  chair, part of the measurement is to your toe; am I

24  correct?

25     A    That is correct.

1    Q    Okay.  So it's -- what I'm trying to get to

2  is, it's not just the chair, it's the chair plus the

3  specifics of your feet?

4    A    That's right.

5        And if you look at that on the overlay of the

6  figure with the little man in it, my toes go right to

7  where his toes go.

8    Q    Yes.  That's all I want to establish is that

9  it's not just front to back of the chair; it's back to

10  front of feet?

11    A    That's right.

12    Q    Okay.  So what is the importance of this

13  30-by-48-inch clear floor space?

14    A    Basically, the bulk of Fair Housing

15  accessibility is driven by the 30-by-48-inch clear

16  floor space and Figures 3 and 3A, the figures.

17    Q    Now, wait.  Those figures are found in what?

18    A    Those figures are found in ANSI.

19    Q    Okay.  So now, the measurement itself is not

20  prescribed in the Fair Housing Act in the law; is that

21  correct?

22    A    That is correct.

23    Q    You would find it in the reference to ANSI;

24  is that correct?

25    A    In the reference to ANSI.

1    One is visually, and one is by actually maneuvering

2    about the space; okay?

3        Q    In your chair?

4        A    Me in my chair.

5        Q    Okay.

6        A    My measurement chair, not this chair that I'm

7    in.

8        Q    Your custom chair?

9        A    Right.   The one built --

10       Q    The tool?

11       A    -- to meet the tool.

12       Q    We'll just call it the tool chair.

13       A    Okay.

14       Q    Okay.

15       A    What's that slope?

16       Q    Now --

17       A    And I can answer it by the naked eye.

18       Q    Okay.

19       A    And I've been able to do it dead on; okay?

20       Q    Now, have you ever been wrong?

21       A    Oh, yeah.

22       Q    Okay.

23       A    By what -- I'd say 8.3 percent, and it's

24   8.2 percent.

25       Q    Okay.

1    A    Or 8.3 percent, and it's 8.4 percent.  So

2    very, very right in that range.  The same is true for

3    elements, knee clearance, heights.

4    Q    If you encounter a ramp -- let's say it

5    exceeds 8.33, but because of your knowledge and

6    experience, you can traverse it.

7         Would you agree that a different person, not

8    as strong as you or with a different type of

9    disability, may not be able to traverse it?

10   A    Rephrase the question, please.

11   Q    Sure.  Okay.

12        If you encounter a ramp that's in excess of

13   8.33, but you are able to roll that ramp, would you

14   agree that a different person who has a different type

15   of disability, or may not be as strong as you, might

16   not be able to traverse it?

17   A    Oh, yes.

18   Q    Okay.  Are there any moments in any of the

19   videos where you can't enter a dwelling unit because

20   of a noncompliant threshold?

21        Like, when we see you pop the wheelie, is

22   that our signal to know that that threshold is not

23   compliant?

24   A    No.  That just means that either it's hitting

25   the bump on the front -- right.  There could be lots

1     Q    So because that's --

2     A    -- it's not a degree.

3          MS. MELODY:  It's getting all messed up.

4          THE WITNESS:  Sorry.

5          MS. BARRON:  Q.  What I'd like to ask is:  If

6     you get a check in the building entrance on an

7     accessible route, does it mean there is not a single

8     gap or a single level change or a single noncompliant

9     slope?

10         What does it mean?

11    A    That means that it was easily accessed.

12    Q    Okay.

13    A    Okay.

14    Q    That means --

15    A    And usable.

16    Q    -- and that means that you were able to

17    access it and use it?

18    A    Yes.

19    Q    Okay.  What criteria do you use to make that

20    evaluation that it was easily accessed?

21    A    We use the two criterias.  The one -- the

22    seven requirements of the act; right?

23    Q    Yes.

24    A    That do not require measurements, and then

25    the fact that we're actually the rolling tool.

1    Q   So now, you're not using a safe harbor when

2  making this assessment?

3    A   No.

4    Q   Okay.  Now, for any of the Post Properties,

5  were you told ahead of time to use a particular safe

6  harbor?

7    A   No.

8    Q   Okay.  When you advise builders about how to

9  comply with the FHA, what standards, if any, do you

10  advise them to follow?

11    A   There are two to three different -- different

12  documents that -- I want to say it this way:  If we

13  are doing a multistory/multifamily tower, we are going

14  to use generally ADAAG for all of the common areas.

15    Q   Why do you say "generally"?

16    A   Because sometimes we'll use the ANSI.  But if

17  I can get -- if I can use the ADAAG, I would rather

18  use the ADAAG, even though it's not a recognized safe

19  harbor.

20    Q   Is that because it provides a greater amount

21  of accessibility?

22    A   There's two reasons for that.  Number one, it

23  provides a greater amount of accessibility.  It's

24  easier to defend [sic].  It's more stringent.

25         And one of the things that I work on

Page 240

1                          J U R A T

2

3

4

5       I, PAUL S. SHERIFF, do hereby certify

6   under penalty of perjury that I have read the

7   foregoing transcript of my deposition taken

8   on October 17, 2013; that I have made such

9   corrections as appear noted herein in ink,

10   initialed by me; that my testimony as

11   contained herein, as corrected, is true and

12   correct.

13

14       DATED this __11__ day of __NOVEMBER__, 2013,

15   at _1000 BISHOP ST, SUITE 888 HONOLULU, HAWAII_, ~~California~~.

16

17

18

19

20

21   _____

22            SIGNATURE OF WITNESS

23

24

25