# United States' Exhibit 14

*United States v. Post Properties, Inc., et al.*

Civil Action No. 10-1866 (RJL)



2 of 2 DOCUMENTS

Analysis
As of: Jan 10, 2014

**MEMPHIS CENTER FOR INDEPENDENT LIVING, Plaintiff, vs. RICHARD AND MILTON GRANT CO., et al., Defendants, and UNITED STATES OF AMERICA, Plaintiff-Intervenor, vs. RICHARD AND MILTON GRANT CO., et al., Defendants.**

**Case No. 01-2069 D**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE, WESTERN DIVISION**

*2004 U.S. Dist. LEXIS 30880*

**June 29, 2004, Decided**
**June 29, 2004, Filed**

**SUBSEQUENT HISTORY:** Motion granted by *Memphis Ctr. for Indep. Living v. Richard & Milton Grant Co., 2005 U.S. Dist. LEXIS 45263 (W.D. Tenn., June 3, 2005)*

**PRIOR HISTORY:** *Memphis Ctr. for Indep. Living v. Makowsky Constr. Co., 2003 U.S. Dist. LEXIS 28440 (W.D. Tenn., July 24, 2003)*

**COUNSEL:** [*1] For Memphis Center for Independent Living, Plaintiff: David Rodney Scruggs, LEAD ATTORNEY, Margaret R. Barr-Myers, LEAD ATTORNEY, Webb A. Brewer, LEAD ATTORNEY, MEMPHIS AREA LEGAL SERVICES, INC., Memphis, TN.

For United States of America, Intervenor Plaintiff: Sara L. Niles, LEAD ATTORNEY, U.S. DEPARTMENT OF JUSTICE, Washington, DC.

For MRB Windyke, LP, Defendant: Theresa L. Kitay, LEAD ATTORNEY, COUGHLIN KITAY & EDELSTEIN, P.C., Marina del Rey, CA; Warren D. McWhirter, LEAD ATTORNEY, McWHIRTER WYATT & ELDER, Memphis, TN.

For Makowsky & Ringel, Inc., Belz Investco, GP, Grant Investment Properties, PC, Richard Milton Grant Company, Jack A. Belz, doing business as Belz Enterprises, Ronald A. Belz, doing business as Belz Enterprises, Jerome H. Hanover, doing business as Belz Enterprises, Defendants: Theresa L. Kitay, LEAD ATTORNEY, COUGHLIN KITAY & EDELSTEIN, P.C., Marina del Rey, CA.

For Belz Investco, LP, Penn Investors, Inc., Makowsky Ringel Greenberg, LLC, Defendants: Leo Maurice Bearman, Jr., LEAD ATTORNEY, BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ-Memphis, Memphis, TN; Theresa L. Kitay, LEAD ATTORNEY, COUGHLIN KITAY & EDELSTEIN, P.C., Marina del Rey, CA; Warren D. McWhirter, LEAD [*2] ATTORNEY, McWHIRTER WYATT & ELDER, Memphis, TN.

For Archeon, Inc, John R. Gillentine, Defendants: John S. Richbourg, LEAD ATTORNEY, SISKIND & SUSSER, Memphis, TN.

For Reaves Sweeney Marcom, Inc., Defendant: William M. Jeter, LEAD ATTORNEY, LAW OFFICE OF WILLIAM JETER, Memphis, TN.

For J. Richard Grant, Milton Grant, Defendants: Jeffery A. Jarratt, LEAD ATTORNEY, John I. Houseal, Jr., LEAD ATTORNEY, GLANKLER BROWN, PLLC, Memphis, TN; Leo Maurice Bearman, Jr., LEAD ATTORNEY, BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ-Memphis, Memphis, TN; Theresa L. Kitay, LEAD ATTORNEY, COUGHLIN KITAY & EDELSTEIN, P.C., Marina del Rey, CA.

For Henry Hart, Henry Hart Engineering Company, P.C., Defendants: Stephen W. Vescovo, LEAD ATTORNEY, THOMASON HENDRIX HARVEY JOHNSON & MITCHELL, Memphis, TN.

For Makowsky Construction Company, Inc., Defendant: Dawn Davis Carson, LEAD ATTORNEY, Robert L. Moore, LEAD ATTORNEY, HEATON & MOORE, P.C., Memphis, TN; Marcy L. Dodds, LEAD ATTORNEY, THOMASON HENDRIX HARVEY JOHNSON & MITCHELL, Memphis, TN.

For MRB-Stonebridge, L.P., JAN Realty, Inc., Belz/South Bluffs, Inc., Defendants: Theresa L. Kitay, LEAD ATTORNEY, COUGHLIN KITAY & EDELSTEIN, P.C., Marina del Rey, CA; Warren [*3] D. McWhirter, LEAD ATTORNEY, McWHIRTER WYATT & ELDER, Memphis, TN.

For Richard and Milton Grant Company, Defendant: Jeffery A. Jarratt, LEAD ATTORNEY, John I. Houseal, Jr., LEAD ATTORNEY, GLANKLER BROWN, PLLC, Memphis, TN; Theresa L. Kitay, LEAD ATTORNEY, COUGHLIN KITAY & EDELSTEIN, P.C., Marina del Rey, CA.

For Parker, Estes & Associates, Inc.: Jeffrey D. Keiner, LEAD ATTORNEY, Joel E. Roberts, LEAD ATTORNEY, GRAY ROBINSON, P.A., Orlando, FL; Stephen H. Biller, LEAD ATTORNEY, THE BOGATIN LAW FIRM, Memphis, TN.

For United States of America, Intervenor Plaintiff: Deborah A. Gitin, LEAD ATTORNEY, Jeanine M. Worden, LEAD ATTORNEY, Kevin Kijewski, LEAD ATTORNEY, Michael S. Maurer, LEAD ATTORNEY, Ming-Yuen Meyer-Fong, LEAD ATTORNEY, Steven H. Rosenbaum, LEAD ATTORNEY, Susan Buckingham Reilly, LEAD ATTORNEY, Thomas J. Keary, LEAD ATTORNEY, UNITED STATES DEPARTMENT OF JUSTICE, Civil Rights Division, Washington, DC; Gary A. Vanasek, LEAD ATTORNEY, Harriett M. Halmon, LEAD ATTORNEY, U.S. ATTORNEY'S OFFICE, Memphis, TN.

For Makowsky Construction Company, Inc., ThirdParty Plaintiff: Robert L. Moore, LEAD ATTORNEY, HEATON & MOORE, P.C., Memphis, TN; Marcy L. Dodds, LEAD ATTORNEY, THOMASON HENDRIX [*4] HARVEY JOHNSON & MITCHELL, Memphis, TN.

**JUDGES:** BERNICE B. DONALD, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** BERNICE B. DONALD

**OPINION**

### ORDER GRANTING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on the motions for summary judgment of Richard and Milton Grant Company, J. Richard Grant, Milton Grant, Henry Hart Engineering, and Parker, Estes & Associates (collectively "Defendants"). Memphis Center for Independent Living and the United States brought this action for alleged violations of the Fair Housing Act ("FHA"), *42 U.S.C. §§ 3601-19*, and Title III of the Americans with Disabilities Act ("ADA"), *42 U.S.C. §§ 12181-89*.

### I. BACKGROUND

Plaintiff Memphis Center for Independent Living ("MCIL") initiated this action on January 25, 2001, alleging that Defendants failed to design and construct apartment complexes in compliance with the FHA. In October 2001, the United States of America joined as a Plaintiff-Intervenor in the action.

The apartment complexes at issue are the Wyndham Apartments ("Wyndham"), in which the United States alleges 2643 FHA violations and 23 ADA violations, and the Camden Grove Apartments ("Camden"), in which the United States alleges 4372 FHA violations and 18 [*5] ADA violations.

Richard and Milton Grant Company, J. Richard Grant, and Milton Grant ("Grant Defendants") designed, built, and own both apartment complexes. Henry Hart Engineering Company ("Hart Engineering") performed the civil engineering work at Wyndham, and Parker, Estes & Associates ("Parker Estes") performed the civil engineering work at Camden.

Both apartment complexes are composed of two-story, non-elevator buildings of eight or twelve units that are joined by garages at the corners. Each apartment unit has its own private entrance, driveway, and attached garage. Each one bedroom unit has a single car garage with a twelve foot wide interior space. Each two bedroom unit has a nineteen foot wide garage. Residents of

each complex share a variety of on-site amenities.[1] Neither complex has sidewalks parallel to the road or sidewalks leading from the roads to ground floor unit entrances. The only paved, pedestrian routes at both complexes are short approach walks from unit driveways to unit entrances and from the roads or parking areas to the entrances of some adjacent site amenities. Wyndham, which consists of 166 ground floor apartments within its fifty-one buildings, was completed [*6] in 1998, seven years after the FHA's accessibility requirements became effective. Construction of Camden began in 2001 and is still underway. Sixty-four buildings are planned, with 276 ground floor apartments.

> 1 Wyndham has mail box kiosks, tennis/basketball courts, a swimming pool, tenant refuse facilities, a gazebo, and a clubhouse containing a leasing office, restrooms, exercise room, and meeting space. Camden has mail box kiosks, a swimming pool, two tennis courts, tenant refuse facilities, and a clubhouse containing a leasing office, restrooms, exercise room, meeting space, and a theater.

The government's expert, architect William Hecker, conducted extensive onsite surveys of Wyndham and Camden to assess their compliance with the accessibility requirements of the FHA and ADA. He reviewed site and architectural plans and measured features that were constructed at the time of his visits to determine whether the complexes conformed with the FHA's requirements. Defendants do not dispute the vast majority of his measurements.

At Wyndham, Defendants operated on the supposition that only seventeen ground floor units had to be accessible to disabled individuals. Therefore, the remaining [*7] 149 of the 166 ground floor units at Wyndham have a step at the unit entrance that prevents a person using a wheelchair from gaining access to those units. Of those, ninety-nine Wyndham units have an additional step at the porch or breezeway leading to the entrance door. Many of the doors to bathrooms, bedrooms, and/or walk-in closets in all of the ground floor units are narrower than the Guidelines requirement. One hundred and forty-nine of the 166 units have thermostats mounted too high for a person using a wheelchair to reach them and lack reinforcement in the bathroom walls to support grab bars near the toilet and bathtub.

Camden had similar features in more than 90% of the sixty-two units that had been constructed in August 2002, when the United States conducted its survey. Twelve of those units have steps in front of the unit door, and forty-five have L-shaped walkways from the driveways to the unit entrances. Camden does not have the entrance steps that Wyndham has, though it has a number of driveways and walkways at slopes above 8.33%, the maximum FHA-compliant grade in many situations. Few if any Guidelines-compliant pedestrian routes exist at Camden for people using wheelchairs [*8] to travel from any ground floor unit to parking, on-site amenities, or the public street. Defendants designed Camden for vehicular access, even to the on-site amenities.

The United States requested a preliminary injunction to halt further construction at Camden, but the Court denied this motion on September 30, 2003. (Order Den. U.S.' Mot. for Prelim. Inj.) After balancing the likelihood of the United States' success on the merits, irreparable harm, the degree of harm to others, and the public interest, the Court denied preliminary injunctive relief, deferring any appropriate relief pending final disposition on the merits.

On December 5, 2003, the Grant Defendants and Parker Estes filed motions for summary judgment. Hart Engineering joined in those motions on the same day. The United States responded on February 19, 2004. The Grant Defendants and Parker Estes replied on March 5, 2004.

## II. STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c).* [*9] In other words, summary judgment is appropriately granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).*

The party moving for summary judgment may satisfy its initial burden of proving the absence of a genuine issue of material fact by showing that there is a lack of evidence to support the nonmoving party's case. *Id. at 325.* This may be accomplished by submitting affirmative evidence negating an essential element of the nonmoving party's claim, or by attacking the opponent's evidence to show why it does not support a judgment for the nonmoving party. 10a Charles A. Wright et al., Fed. Prac. & Proc. § 2727, at 35 (2d ed. 1998).

Facts must be presented to the court for evaluation. *Kalamazoo River Study Group v. Rockwell Int'l Corp., 171 F.3d 1065, 1068 (6th Cir. 1999).* The court may consider any material that would be admissible or usable at trial. 10a Charles A. Wright et al., Fed. Prac. & Proc. § 2721, at 40 (2d ed. 1998). In evaluating a motion for summary judgment, all the evidence and [*10] facts

Case 1:10-cv-01866-RJL   Document 63-17   Filed 01/14/14   Page 5 of 12

Page 4
2004 U.S. Dist. LEXIS 30880, *

must be viewed in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*; *Wade v. Knoxville Utils. Bd., 259 F.3d 452, 460 (6th Cir. 2001)*.

## III. ANALYSIS

The FHA embodies "a national commitment to end the unnecessary exclusion of persons with [disabilities] from the American mainstream" by increasing the stock of accessible housing in furtherance of Congress's "goal of independent living." H.R. Rep. No. 100-711, at 18 (1988), reprinted in 1988 U.S.C.C.A.N. 2173, 2179. The Act includes a broad prohibition of discrimination on the basis of disability in the sale or rental of a dwelling, *42 U.S.C. §§ 3604(f)(1)-(2)*. It also defines "discrimination" as the failure to design and construct covered multifamily dwellings, designed for first occupancy after March 13, 1991, in such a manner that:

> (i) the public and common use portions of the dwellings are readily accessible to and usable by persons with disabilities;
>
> (ii) all the doors designed to allow passage into and within all premises within the dwellings are sufficiently wide to allow passage by persons using wheelchairs; and
>
> (iii) all premises within the dwellings [*11] contain the following features of adaptive design:
>
>> (I) an accessible route into and through the dwelling;
>>
>> (II) light switches, electrical outlets, thermostats, and other environmental controls in accessible locations;
>>
>> (III) reinforcements in bathroom walls to allow later installation of grab bars; and
>>
>> (IV) usable kitchens and bathrooms such that an individual using a wheelchair can maneuver about the space.

Id. at *§ 3604(f)(3)(C)*.

Congress authorized the Secretary of HUD to promulgate regulations to implement the FHA and provide technical assistance to help achieve the Act's accessibility requirements. Id. at *§§ 3601, 3604(f)(5)(C)*. Pursuant to this authority, HUD issued implementing regulations in 1989 that expounded on the FHA's design and construction requirements. *24 C.F.R. § 100.200 et seq.* HUD issued the Guidelines two years later. 56 Fed. Reg. 9473-9515 (Mar. 6, 1991).

The HUD Guidelines guide builders to compliance, but they are merely examples of compliance and therefore not mandatory. Id. at 9472. "The purpose of the Guidelines is to describe minimum standards of compliance with the specific accessibility requirements of the Act." Id. at 9476. A failure to meet the requirements [*12] as interpreted in the Guidelines does not constitute unlawful discrimination. Id. The Guidelines are "intended to provide a safe harbor for compliance with the accessibility requirements of the Fair Housing Amendments Act.... Builders and developers may choose to depart from the Guidelines, and seek alternate ways to demonstrate that they have met the requirements of the Fair Housing Act." Id. at 9473. The FHA and the Guidelines also provide that another acceptable way to make these areas and features accessible is through compliance with American National Standards Institute [2] ("ANSI") 117.7-1986, American National Standard for Buildings and Facilities - Providing Accessibility and Usability for Physically Handicapped People. Thus, the Guidelines, though relevant and highly significant, are not decisive. The real question is whether the units and common areas are reasonably accessible and usable for most physically disabled people.

> 2   ANSI is a private, national organization that publishes standards on a wide variety of subjects. See *54 Fed. Reg. 3243 (Jan. 23, 1989)*.

If a construction feature does not comply with the Guidelines, then the housing provider defending an FHA violation has [*13] the burden of showing that the feature is nonetheless accessible. See id. ("Builders and developers may choose to depart from the Guidelines, and *seek alternate ways to demonstrate* that they have met the requirements of the Fair Housing Act.") (emphasis added); *United States v. Hallmark Homes, Inc., No. CV01-432, 2003 U.S. Dist. LEXIS 20814, 2003 WL 23219807, at *8 (D.Idaho Sept. 29, 2003)*. The Guidelines provide that compliance may be achieved by meeting a "comparable standard" - i.e., one that provides "access essentially equivalent to or greater than required by ANSI A117.1." [3] *54 Fed. Reg. 3243*.

3    Since 1991, HUD has recognized safe harbors, in addition to the Guidelines and ANSI A117.1-1986. These include HUD's Fair Housing Act Design Manual (1998), ANSI A117.1-1992, and ANSI A117.1-1998. See *65 Fed. Reg. 15740, 15755 (Mar. 23, 2000)*; *68 Fed. Reg. 30413*-02 (May 27, 2003). The 2000 Code Requirements for Housing Accessibility and the International Building Code, both promulgated by the International Code Council are also safe harbors. See Code Requirements for Housing Accessibility at pp. iii-v. These safe harbors are not at issue in the instant case, as Plaintiffs argue that they require equal or greater accessibility [*14] than the Guidelines, and Defendants do not mention them.

## A. Routes from Ground Floor Units to the On-Site Amenities and Public Streets

HUD's regulations and Guidelines require accessible pedestrian routes from covered units to public and common use areas, with few exceptions. Defendants admit that accessible pedestrian routes do not exist from the public street to ground floor units. Instead, they argue that most units are exempted from any accessible route requirement due to site impracticalities, such as hills, and the remaining non-conforming units have accessible routes for vehicular access, rather than pedestrian access.

The Court first looks to whether there are impracticalities at the two apartment complex sites sufficient to exempt the buildings from the FHA. Defendants claim that the site impracticality exemption allows up to 104 of their 442 ground floor units (thirty-eight at Wyndham and up to sixty-six at Camden) to be inaccessible by persons with disabilities. HUD's implementing regulations require each covered dwelling to be served by at least one building entrance on an accessible route "unless it is impractical to do so because of the terrain or unusual characteristics [*15] of the site." *24 C.F.R. § 100.205(a)*. "The burden of establishing impracticality because of terrain or unusual site characteristics is on the person or persons who designed or constructed the housing facility." Id. Exemptions to the FHA must be "construed narrowly, in recognition of the important goal of preventing housing discrimination." *Fair Hous. Advocates Ass'n. Inc. v. City of Richmond Heights, 209 F.3d 626, 634 (6th Cir. 2001)*, quoting *Massaro v. Mainlands Section 1 & 2 Civic Ass'n. Inc., 3 F.3d 1472, 1475 (11th Cir. 1993)*. Even in this area of little precedent, courts have shown that the burden for showing site impracticality is heavy. See *Mont. Fair Hous., Inc. v. Amer. Capital Dev., Inc., 81 F. Supp. 2d 1057, 1066 (D.Mont. 1999)*; Baltimore Neighborhoods, Inc. v. Sterling Homes Corp., No. Civ. 96-915, 1999 WL 1068458, at *3 (D.Md. Mar. 25, 1999).

While the regulations do not set out how to meet the impracticality exemption, the Guidelines outline two tests to establish when normally covered dwelling units in non-elevator buildings may be excluded from coverage due to site impracticality. *56 Fed. Reg. 9499, 9503-04*. The two tests are the individual building test and the site [*16] analysis test. Id.; Sterling Homes, 1999 WL 1068458, at *3. Defendants rely upon the site analysis test. The Guidelines describe three steps to determine whether ground floor units in an apartment complex may be exempted from the FHA based on site terrain:

> (A) The percentage of the total buildable area of the undisturbed site with a natural grade less than 10% slope shall be calculated. The analysis of the existing slope (before grading) shall be done on a topographic survey with two foot (2') contour intervals with slope determination made between each successive interval. The accuracy of the slope analysis shall be certified by a professional licensed engineer, landscape architect, architect or surveyor.
>
> (B) To determine the practicality of providing accessibility to planned multi-family dwellings based on the topography of the existing natural terrain, the minimum percentage of ground floor units to be made accessible should equal the percentage of the total buildable area (not including flood plains, wetlands, or other restricted use areas) of the undisturbed site that has an existing natural grade of less than 10% slope.
>
> (C) In addition to the percentage established in paragraph (B), [*17] all ground floor units in a building, or ground floor units served by a particular entrance, shall be made accessible if the entrance to the units is on an accessible route, defined as a walkway with a slope between the planned entrance and a pedestrian or vehicular arrival point that is no greater than 8.33%.

*56 Fed. Reg. 9503-04 (1991)*.

Defendants argue that thirty-eight units at Wyndham and up to sixty-six units at Camden should be exempted from the FHA for site impracticality. Defendants proffer post-construction measurements to support their position that an accessible route from the arrival point to the entry

door cannot be created with a slope of 8.33% or less at any of the units. To meet their burden under the site impracticality test, Defendants essentially argue that they cannot comply with the FHA because the units, as built, do not comply with FHA requirements. The United States would prefer that the Court look to pre-construction measurements. The United States pointed out the circularity of Defendants' argument when it wrote, "the Grant defendants are asking the Court to assume based on the mere fact that accessible pedestrian routes were not constructed that such routes [*18] could not have been constructed." (U.S.' Post [Prelim. Inj.] Hr'g Br. at 54.) Moreover, Defendants make no attempt to explain why the Wyndham units were built with such steep slopes, when they admit that the complex is generally flat. Even if the Court were to accept valid post-construction evidence, [4] Defendants have failed to meet this heavy burden. Therefore, the Court finds that no ground floor units in either Camden or Wyndham are exempt from FHA requirements based on site impracticality.

> 4 The Court notes that the Grant Defendants' pinpoint analysis is not such valid evidence. They argue that
>
>> rather than applying the 4" per step rise over the entire length of the approximately 18' walkway, it is appropriate for Step C of the site analysis test to consider the slope of that portion of the route that has the steps. Using this "pinpoint" analysis -- consistent with the United States' analysis on other slope issues -- a 7" rise over a standard 11" tread creates a slope over 36%.
>
> (Grant Defs.' Opp. at 24.) Their 36% incline measurement is conducted directly upon the steps in the approach walk, and therefore the incline will be the same at any set of standard stairs. Therefore, the [*19] Grant Defendants would like the Court to consider the fact that they have constructed an approach with two steps to prove that the walk could not have been created without the steps.

Defendants rest much of their argument against liability on the assertion that accessible routes need not be designed for pedestrian use since the complexes are designed for vehicular traffic. This vehicular exemption, also narrowly construed, applies:

> if the slope of the finished grade between covered multifamily dwellings and a public or common use facility (including parking) exceeds 8.33%, or where other physical barriers (natural or manmade), or legal restrictions, all of which are outside the control of the owner, prevent the installation of an accessible pedestrian route, an acceptable alternative is to provide access via a vehicular route, so long as necessary site provisions such as parking spaces and curb ramps are provided at the public or common use facility.

*56 Fed. Reg. 9504.* The United States argues that "all of which are outside the control of the owner" modifies all the conditions in this Guideline, while Defendants argue that it modifies only the physical barriers and legal restrictions. [*20] Therefore, Defendants contend that the finished grade of the property need not be beyond their control, and the United States advocates the opposite reading. Under the Defendants' interpretation, "outside the control of the owner" would be rendered meaningless. Defendants argue that under the United States' interpretation, "the provision regarding the slope of the finished grade would be a vestigial circumstance that would never occur in the real world of construction." (Grant Defs.' Opp. to Pl.'s Mot. for Summ. J. at 28.)

The cardinal principle of statutory construction is "to give effect, if possible, to every clause or word of a statute." *Duncan v. Walker, 533 U.S. 167, 173, 121 S. Ct. 2120, 150 L. Ed. 2d 251 (2001)* (citations omitted). The Court applies this canon of interpretation to the Guidelines as well. Therefore, the Court will attempt a reading of the Guideline that gives effect to all phrases. As between the two readings, the United States' version is more convincing, since it supports an internally consistent reading of the Guideline. The "all of which" language refers to all of the preceding conditions. The physical barriers in the property are generally within a housing provider's control. A housing provider [*21] would need to show that the conditions were outsider of its control if it provided an inaccessible pedestrian route. [5]

> 5 There are surely areas so surrounded by heavily developed property as to prevent serious grading or so steep that it would be impracticable to create an 8.33% grade. The Guideline elucidates that physical conditions are generally with the housing provider's control, and it would be the provider's burden to show impracticality.

Since the vehicular exemption is an exception to the FHA, Defendants bear the burden of showing that the property was so fraught with obstacles as to prevent the construction of accessible pedestrian routes. Defendants must produce more evidence than the mere fact that the paved routes, in their constructed state, are over 8.33%. As with the site impracticality exemption, proof of the exemption through the mere showing of the currently paved routes is insufficient because that would improperly shift the burden away from Defendants to Plaintiffs on a showing of an FHA violation. The burden of establishing impracticality and other exemptions is clearly on Defendants. *24 C.F.R. § 100.205(a)*. Moreover, Plaintiffs have produced expert testimony with [*22] supporting evidence showing that extensive regrading occurred at Camden, the site could have been graded to produce accessible pedestrian routes, and that no uncontrollable barriers or restrictions preclude the installation of accessible pedestrian routes. (U.S.' Post [Prelim. Inj.] Hr'g Br. at 7, 21, 43.) The United States has an even more striking case at Wyndham, where the terrain was flat prior to construction.

Defendants argue in addition that the vehicular exemption applies because "[v]ehicular access is an integral part of the design of both Camden Grove and Wyndham." (Grant Defs.' Opp. to Pl.'s Mot. for Summ. J. at 25.) The Grant Defendants argue that they have attempted to create the atmosphere of single family home subdivisions in these two apartment complexes. [6] (Id.) While single family homes are not subject to the FHA, apartment complexes are subject to the FHA. See *42 U.S.C. § 3604(f)(3)(C)* (including "covered multifamily dwellings" within the FHA). The "unique" vehicular-oriented design of the apartment complexes does not exempt the complexes from the FHA, even if the complexes were designed in light of a substantial market preference for independent single family homes. [*23] Nor are the complexes exempt due to the lack of development around the complexes (notably at Camden), the assumption that all potential residents would own a car, or the lack of sidewalks along public roads. The FHA, regulations, and precedent make absolutely no mention of these factors, and the Court declines to consider them. [7]

> 6 Parker Estes states that the United States "seeks to stymie the creation of non-traditional apartment complexes" and essentially decrees to apartment builders "No Vehicular Access Allowed." (Parker Estes Mem. in Resp. to U.S.A's Mot. for Summ. J. at 8.) Parker Estes is mistaken, as the government advocates the inclusion of both pedestrian and vehicular access on public roads, and the Court agrees that the FHA attempts to create just such a choice for disabled individuals.

> 7 Defendants also argue that the United States bases its arguments against the vehicular exemption "on interpretations and assumptions by the Government about what is 'best' for people with disabilities, rather than an application of the actual statutory requirements of the Act to these properties." (Grant Defs.' Opp. to Pl.'s Mot. for Summ. J. at 13.) The United States argues that housing [*24] providers must create surroundings that welcome both the use of wheelchairs and cars. It seems that the Government is mandating the provision of choices to people who use mobility aids and cars, rather than limiting choices to only vehicles as the Grant Defendants claim.

The Court's finding is consistent with the intent of the Guidelines. As HUD emphasized in the Guidelines' Preamble, "the Department's expectation is that public and common use facilities generally will be on an accessible pedestrian route. The Department, however, recognizes that there may be situations in which an accessible pedestrian route simply is not practical, because of factors beyond the control of the owner." *56 Fed. Reg. 9485*. In light of the statute, regulations, and precedent, Defendants' argument that the vehicular exemption is an alternative method of compliance with the FHA, rather than an exception to the rule, is not well-taken.

### B. Clubhouses

Wyndham's clubhouse contains a leasing office, restrooms, an exercise room, and space for meetings. Camden's clubhouse contains a leasing office, an exercise room, space for meetings, and a theater. These facilities are common use areas subject to the *FHA. 56 Fed. Reg. 9485-86, 9505*. [*25] The Grant Defendants admit to the interior violations at the clubhouses, but they argue that they have ameliorated the situation: "While many of these assertions are admittedly undisputed in the original state of the properties, in many instances, the Grant Defendants have made significant changes to Wyndham and Camden Grove that negate the Plaintiff's claim that these areas are not accessible." (Grant Defs.' Opp. to Pl.'s Mot. for Summ. J. at 30.) The instant case is in the liability phase of the proceedings, and any recent improvements, (see id. at 18-19, 30-31) do not reduce Defendants' responsibility for violating the law in the first instance. The FHA requires all ground floor units to be built accessible, not made accessible only when requested by tenants or after suit by the Government. The Court has granted summary judgment on this issue to the United States. (See Order Granting Partial Summary Judgment for the United States (Doc. No. 505) at 15.) The Court will consider favorably any improvements and accommodations on the issue of damages at trial.

**C. Parking**

1. Parking Connected to Residential Units

Defendants argue that Camden and Wyndham offer parking to persons with disabilities [*26] on an equal basis with other residents. HUD has specifically stated that attached garages do not need to be accessible. See Supplement to Notice of Fair Housing Accessibility Guidelines: Questions and Answers about the Guidelines, 24 CFR Ch. 1 at Question 10. Despite HUD's interpretation, the United States argues that the statutory prohibition on discrimination in "terms" and "conditions" in housing, *42 U.S.C. § 3604(f)(2)*, supports an equitable argument that Wyndham and Camden cannot provide covered parking spaces for its residents without providing the requisite number of covered parking spaces on accessible routes for its residents with disabilities.

Under a Chevron analysis, rules and regulations promulgated by an administrative agency "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron v. Nat'l Res. Def. Council, 467 U.S. 837, 844, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)*. As long as HUD's interpretation is not arbitrary, capricious, or manifestly contrary to the FHA, this Court is directed to defer to that interpretation, HUD being the agency with the authority and expertise to interpret the FHA. See *U.S. v. Edward Rose, 246 F. Supp. 2d 744 (E.D. Mich. 2003)*. [*27] Upon review of the regulations dealing with attached garages, the Court finds that the interpretation is not arbitrary, capricious, or manifestly contrary to the statute. When Congress developed and passed the FHA, it clearly aimed to eliminate housing discrimination against people with disabilities, but not regardless of cost. Housing providers may be exempted from liability under the FHA for a limited number of cost-related reasons, including site impracticality. HUD could rationally have found that accessible attached garages were too difficult or costly to justify requiring them. The United States' exhibit, "A Day in the Life," displays significant accessibility issues in the attached garages, and it leads to the conclusion that a private accessible parking garage would be quite expensive. The United States argues that 2% of the units should have accessible one-car garages with more parking available on request. (See Pl. U.S.' Mem. in Supp. of its Mot. for Summ. J. at 25.) This concession would be analogous to a requirement for accessible parking at public and common use areas, which is fully developed in the following subsection.

One of the most innovative aspects of the FHA was [*28] that it required full compliance of all ground units in apartment complexes, thereby eliminating the possibility that any of the units would be specifically labeled "disabled." All units must now be accessible to people who use wheelchairs and other mobility aids. By not requiring attached garages to be compliant with the FHA, housing providers may build all ground units in a similar, generally accessible fashion. To require 2% of the units to have special garages would again label some units better fit to disabled people than others. Without this 2% requirement, though people who use wheelchairs would not have accessible garages, they would be free to choose any ground unit that is available. These are the sorts of decisions that HUD, as an experienced interpreter of the FHA, is better able to make than is the Court. Since HUD's interpretation of the FHA is not arbitrary, capricious, or contrary to the FHA, the Court will defer to its determination that private attached garages need not be accessible. The Court grants summary judgment to Defendants on the issue of attached garages.

2. Parking for Visitors

Defendants next argue that the apartment complexes' visitor parking is FHA compliant. [*29] The Guidelines require accessible visitor parking to the extent that visitor parking is provided. *56 Fed. Reg. 9505*. Garage parking cannot function as accessible visitor parking, as the Guidelines state that private garage parking need not comply with the FHA. Defendants argue that the driveway and street parking serves as visitor parking. The United States responds that street and driveway parking is inaccessible to guests with disabilities "because the routes from those locations to the ground floor unit entrances - the driveways themselves - are not accessible due to lips and excessive slopes." (Pl. U.S.' Mem. in Supp. of its Mot. for Summ. J. at 26 (citation omitted).) The Court already decided that Defendants failed to establish a genuine issue of material fact on FHA compliance of the driveways, as Defendants were unable to rely on the site impracticality or vehicular exemptions to the FHA. If the driveways are inaccessible to resident who use wheelchairs, it follows that the driveways are inaccessible to visitors who use wheelchairs. A significant issue of fact as to Defendants' liability remains. The Court denies Defendants' motions for summary judgment as to liability for [*30] lack of visitor parking.

3. Parking for Complex Amenities

Where parking is provided at complex amenities, the Guidelines require accessible parking. *56 Fed. Reg. 9504-05*. The Grant Defendants admitted that Wyndham's swimming pool complex and tennis/basketball courts lack such accessible parking facilities. The accessible parking space at the Wyndham clubhouse also lacks an access aisle, is not located on the shortest route of travel to the building, and has an adjacent slope and cross-slope beyond the ANSI maximums. The Court

Case 1:10-cv-01866-RJL Document 63-17 Filed 01/14/14 Page 10 of 12

Page 9
2004 U.S. Dist. LEXIS 30880, *

granted summary judgment to the United States as to Defendants' liability for parking at complex amenities. *(See* Order Granting Partial Summary Judgment for the United States (Doc. No. 505) at 18.)

No designated accessible parking spaces serve either complex's refuse or mail facilities. Defendants argue that the facilities are not intended as places where residents would park because residents would merely stay a few minutes. The Grant Defendants simultaneously argue that all facilities are designed to be accessed by vehicles and that the mail and refuse facilities do not require parking. The Court finds these arguments inconsistent. Moreover, Defendants offer [*31] no alternate industry standards or comparable equivalent to support their version of vehicular access. They offer merely the testimony of their expert, who reiterates that the access to mail and refuse facilities is intended for only minutes at a time. If the facilities are designed to accommodate drive-in usage, they should also be designed to accommodate vehicles under the requirements of the FHA. To deviate from the ANSI and Guideline requirements, Defendants bear the burden of showing that they have met some comparable standard of access and safety. Defendants failed to show that there is no genuine issue of material fact. Accordingly, the Court has granted summary judgment on liability for non-compliance of amenity parking, including mail and refuse facilities to the United States. *(See* Order Granting Partial Summary Judgment for the United States (Doc. No. 505) at 19.)

The Court has also granted the United States summary judgment on a number of undisputed violations in interior aspects of the residential units. (See id. at 19-23.) Therefore, the Court denies Defendants motions for summary judgment as to parking for complex amenities and interior aspects of the residential units. [*32]

**D. Punitive Damages**

Defendants move for summary judgment as to the availability of punitive damages in this action. Punitive damages are appropriate under the FHA when defendants act "with malice or reckless indifference that their actions might violate a federal statute of which they were aware." *Hamad v. Woodcrest Condominium Ass'n, 328 F.3d 224, 239 (6th Cir. 2003)*, citing *Preferred Props., Inc. v. Indian River Estates, Inc., 276 F.3d 790, 800 (6th Cir. 2002)*. Defendants cite the following factors as evidence of their lack of malice: compliance with local laws, the unsettled federal law, "a federal agency that had no mechanism for answering questions or reviewing plans," and an inspector "who refused to give any indication as to any issue he found." (See Mem. of Law in Supp. of Parker Estes's Mot. for Summ. J. at 5; Grant Defs.' Mem. in Supp. of Mot. for Summ. J. at 4.) The Grant Defendants insist that they were not even aware of FHA requirements until Milton Grant received a letter from MCIL in early 2001. (M. Grant Dep. 4/23/03 at 140:21-141:19.)

The United States cites record evidence to the contrary. In a memorandum that Milton Grant acknowledged and produced through discovery, [*33] an engineer unambiguously informed Grant of the detailed requirements of the FHA. (Pl. U.S.' Opp. to Defs.' Mots. for Summ. J., Ex; 2.) The memorandum, dated March 17, 1997, was transmitted four years prior to the date Grant first attests knowledge in 2001. The Grant Defendants concede that "accessibility issues" constitute violations of the FHA with respect to at least 128 or the 166 units at Wyndham, and these impediments remain uncorrected to this day. (See Grant Defs.' Opp. to U.S. Mot. for Summ. J. at 8, 17, 38.) On September 25, 2001, the United States sent the Grant Defendants the expert report illustrating FHA violations at Wyndham. (M. Grant Dep. 10/2/02 at 416:13-417:2; Ex. 27.) Nevertheless, the Grant Defendants began construction of Camden in the fall of 2001, replicating at Camden many of the violations present at Wyndham. (See U.S. Material Statement of Facts Supp. Mot. for Summ. J. at 189 (disclosing, among other violations, inaccessible pedestrian routes and steps at unit entrances).) The Grant Defendants were given an administrative interpretation of the FHA by the federal agency charged by Congress with its enforcement, and they chose to act contrary to that interpretation. [*34] Therefore, the Court questions the Grant Defendants' allegation that "they made the best efforts they could with a law that is hardly clear." (Grant Defs.' Mem. Supp. Mot. for Summ. J. at 4.)

The United States presents evidence from the record to dispute Parker Estes's lack of reckless indifference as well. According to Robert Estes, partner of Parker Estes, Milton Grant proposed Camden as a development that would have access points from garages. (Estes Dep. at 67.) Estes was familiar with the Guidelines because he had performed site analysis tests for another developer in the early 1990s to determine whether particular ground floor units qualified for the FHA's site impracticality exemption. (Id. at 61.) Nevertheless, Estes never contacted HUD or consulted its publications to determine whether it was "reasonable" under the FHA to design a grading plan for an apartment complex in which the only accessible pedestrian route for a wheelchair user was from the garage or driveway. Nor did Parker Estes contact HUD or consult its publications when Milton Grant asked it to perform a site analysis test at Camden in March 2001. (Id. at 62.) The Grant Defendants did not pay Parker Estes to complete [*35] Step C of the site analysis, so the firm informed the Grant Defendants that seventy-three to seventy-four of the Camden units were accessible, though they had not completed the analysis.

The United States argues that Parker Estes "simply 'delivered the goods' ordered by the developer, without any independent thought or research as to the Act's requirements." (Pl. U.S.' Opp. to Defs.' Mots. for Summ. J. at 11.) Thus, the United States presented evidence that undermines and contradicts Defendants' assertions that they did not have reckless disregard for the law.

In light of those facts, the Court finds that a genuine issue of material fact exists as to Defendants' malice or reckless indifference to violations of the FHA. Accordingly, Defendants' motions for summary judgment on the issue of punitive damages is denied.

### E. Civil Penalties

The Court has wide discretion on the question of civil penalties. The factors the Court considers in assessing a civil penalty are: 1) the nature of the violation; 2) the degree of culpability; 3) any history of prior violations; 4) the financial circumstances of the defendants; 5) the goal of deterrence; and 6) other matters as justice may require. H.R. [*36] Rep. No. 100-711, reprinted in 1988 U.S.C.C.A.N. 2173 at 2201. Generally courts decide the question of civil penalties after trial. See *United States v. Balistrieri, 981 F.2d 916, 936-37 (7th Cir. 1992)*; *United States v. Oak Manor Apartments, 11 F. Supp. 2d 1047, 1053-54 (W.D. Ark. 1998)*. The nature of the FHA violations and the degree of culpability as to each defendant will be supported with further evidence at trial. A genuine issue of material fact exists as to the presence of multiple factors. Therefore, the Court will stay its hand and leave the question of civil penalties for trial. Defendants' motions for summary judgment on civil penalties are denied.

### IV. CONCLUSION

Since there is no genuine issue of material fact as to resident parking, Court **GRANTS IN PART** the motions for summary judgment of the Grant Defendants' (Doc. No. 455), Parker Estes (Doc. No. 459), and Hart Engineering (Doc. No. 464).

A genuine issue of material fact remains as to Defendants liability, or the Court has previously granted summary judgment to the United States, in all other areas. Accordingly, the Court **DENIES** Defendants' motions for summary judgment on 1) the routes from all ground floor units to [*37] on-site amenities and public streets, 2) clubhouses, 3) parking at complex amenities, 4) punitive damages, and 5) civil penalties.

**IT IS SO ORDERED** this, 29 day of June 2004.

/s/ Bernice B. Donald

BERNICE B. DONALD

UNITED STATES DISTRICT JUDGE

123D5H

********** Print Completed **********

Time of Request: Friday, January 10, 2014   16:27:08 EST

Print Number:    2825:444684391
Number of Lines: 470
Number of Pages:

Send To:  Thomas, Lygia
          CIVIL RIGHTS DIVISION HOUSING SECTION
          1425 NEW YORK AVE NW ROOM 5066
          WASHINGTON, DC 20005