## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil Case No. 10-1866 (RJL)** |
| | ) | |
| MID-AMERICA APARTMENT | ) | **FILED** |
| COMMUNITIES, INC., *et al.*, | ) | |
| | ) | MAR 2 7 2017 |
| Defendants. | ) | |
| | | Clerk, U.S. District & Bankruptcy |
| | | Courts for the District of Columbia |

## MEMORANDUM OPINION
March **27**, 2017 [Dkts. #90, #93]

Plaintiff, the United States of America ("the Government"), brings suit against

defendants Mid-America Apartment Communities, Inc. and Mid-America Apartments,

L.P., alleging that its predecessor companies, Post Properties, Inc., Post Apartment

Homes, L.P., and Post GP Holdings, Inc. (together, "Post"), engaged in a pattern or

practice of discrimination under the Fair Housing Act, as amended by the Fair Housing

Amendments Act of 1988 ("the FHA"), 42 U.S.C. §§ 3601-31, and Title III of the

Americans with Disabilities Act of 1990 ("the ADA"), *id.* §§ 12181-89. Compl. ¶ 1

[Dkt. #1]. Because "Post" became "Mid-America" only recently [Dkt. #111], and the

events and filings at issue here all took place while the companies were still operating as

"Post," I will continue to refer to the defendants by that name in this opinion. This matter

is before the Court on motions by both the Government and Post to clarify certain legal

issues in advance of trial. *See* Defs.' Mot. to Resolve Legal Issues in Advance of Trial

[Dkt. #90]; U.S.'s Mot. for Pre-Trial Rulings [Dkt. #93]. Namely, the parties seek

guidance on what sort of evidence would be legally sufficient to satisfy the Government's

burden to demonstrate that Post has engaged in a pattern or practice of discriminatory

behavior under the FHA and what sort of evidence is legally relevant to contradict that

contention. Additionally, Post seeks an evidentiary ruling as to the appropriate scope of

expert witness testimony. It also seeks to exclude from evidence a number of the 50

multifamily dwellings that the Government has alleged have accessibility problems,

claiming that they are inadmissible to support the Government's pattern or practice claim.

As I explain more fully with respect to each issue below, the parties' motions are each

GRANTED IN PART and DENIED IN PART.

## I.     The Proper Role of the HUD Guidelines in Proving an Instance of Housing Discrimination Is Limited.

The FHA prohibits housing discrimination on the basis of a handicap. 42 U.S.C.

§ 3604(f). In the type of dwellings at issue here, which the statute seeks to regulate, the

FHA requires that public areas must be "readily accessible to and usable by handicapped

persons," the doors must be wide enough to allow passage into and within the premises

by people in wheelchairs, and the individual units must contain four enumerated features

of "adaptive design." [1]  *Id.* § 3604(f)(3)(C). The statute charges the Secretary of the

Department of Housing and Urban Development with the responsibility to enforce these

requirements by bringing administrative enforcement actions to correct non-compliant

---

[1] The four features of adaptive design are "(I) an accessible route into and through the dwelling; (II) light switches, electrical outlets, thermostats, and other environmental controls in accessible locations; (III) reinforcements in bathroom walls to allow later installation of grab bars; and (IV) usable kitchens and bathrooms such that an individual in a wheelchair can maneuver about the space." 42 U.S.C. § 3604(f)(3)(C)(iii).

buildings. *See* 42 U.S.C. § 3601, *et seq.* Additionally, a "failure to design and construct" a building in accordance with these requirements constitutes discrimination "because of a handicap" under the FHA and the statute charges the Department of Justice with the responsibility to pursue claims against parties who engage in a pattern or practice of discrimination of this kind. *Id.* § 3604(f); *id.* § 3614(a).

In this case, the Government claims that Post has engaged in a pattern or practice of discrimination by failing to design and construct 50 multifamily dwellings in accordance with the accessibility requirements of the FHA over 20 years, from 1997 to 2008. Compl. ¶¶ 16-20. To win the pattern or practice case, the Government must prove that designing and constructing inaccessible dwellings was Post's "standard operating procedure, the regular rather than the unusual practice." *Int'l Bhd. Of Teamsters v. United States*, 431 U.S. 324, 336 (1977).

As evidence, the Government plans to rely on expert testimony that the 50 properties did not satisfy the set of measurements and specifications known as the HUD Guidelines, which are a set of criteria developed by the Department of Housing and Urban Development ("HUD") that serve to warn the public what it will consider presumptively accessible when it decides whether to bring an enforcement action charging that a building fails to meet the requirements of the FHA. U.S.'s Mem. of P. & A. ISO Its Mot. for Pre-Trial Rulings ("Gov't's Mem.") 2 [Dkt. #93-1]. By virtue of this warning, the HUD Guidelines provide a concrete benchmark for builders to know, regardless what the law actually requires, that HUD will not prosecute them under it, a phenomenon commonly referred to as a prosecutorial "safe harbor." But the Government

is here seeking to turn this shield into a sword.  It argues that if it establishes that Post's 50 properties do not comply with the HUD Guidelines, it is entitled to a presumption, rebuttable only by a narrow category of evidence, that the buildings were not designed and constructed in compliance with the FHA.  *Id.*  The Government reasons that the rebuttable presumption is warranted because the HUD Guidelines are the least restrictive of ten sets of accessibility criteria that HUD has approved as safe harbors for builders. *See id.* at 4 (quoting 56 Fed. Reg. 9476 for the proposition that the HUD Guidelines "describe minimum standards of compliance with the specific accessibility requirements of the Act").  Furthermore, it points out that if the HUD Secretary had brought an administrative action to challenge the design of each property, the agency would have been owed deference in the decision to use the HUD Guidelines to establish a rebuttable presumption of non-compliance. *See id.* at 8-11; U.S.'s Reply ISO Its Mot. for Pre-Trial Rulings 2-5 [Dkt. #96].  These arguments are unavailing because, as a general matter, the internal operating procedures of HUD are not dispositive for the federal courts. Furthermore, Congress has not delegated authority to HUD to define the minimum standards for accessibility, and therefore the Court has no reason to defer dispositively to HUD's interpretation or to adopt its procedure in this pattern or practice case.

It is true that HUD relies on the Guidelines as part of a burden-shifting framework it uses for administrative enforcement actions.  Under that framework, HUD establishes a *prima facie* case of inaccessibility in violation of the FHA by showing non-compliance with the HUD Guidelines.  Thereafter, the burden shifts to the defendant to demonstrate compliance with either a different HUD safe harbor or another "comparable standard,"

which HUD interprets to mean only a comprehensive set of specifications and measurements similar to one of its sets of safe harbor criteria. *See* Gov't's Mem. at 7; 24 C.F.R. § 100.201. According to the Government, this framework has "the force of law" because it was adopted by HUD in what the parties refer to as the *Nelson* Order, named after the administrative adjudication in which the HUD Secretary outlined how the agency would exercise its enforcement powers under the FHA. *See id.* at 7-9 (quoting *HUD ex rel. Mont. Fair Hous., Inc. v. Brent Nelson*, No. HUDALJ 05-068FH, 2006 WL 4573902 (Sept. 21, 2006), *petition for review denied* 320 F. App'x 635 (9th Cir. 2009)). But the Government is wrong to suggest that the *Nelson* Order has any binding force outside the agency.

Indeed, on its face the *Nelson* Order does not purport to bind federal courts in any way. Moreover, it would be inappropriate for a federal court to give *Chevron* deference to the *Nelson* Order in a case such as this where the Court is *not* reviewing agency action. This is not a case where HUD applied the *Nelson* Order, or the HUD Guidelines, in an enforcement action that the court is then asked to review. Nor does the Government point to any evidence in the text of the FHA that it was delegated authority to draft either the minimum specifications for accessibility or the procedure for determining the fact of accessibility. To the contrary, the only rulemaking authority that the FHA delegates to HUD is specifically cabined to the procedures necessary to pursue its enforcement discretion. *See* 42 U.S.C. § 3614a.[2] In short, I can find no precedent for giving *Chevron*

---

[2] The text of the sole rulemaking delegation in the FHA reads: "Rules to Implement Subchapter: The Secretary may make rules (including rules for the collection, maintenance, and analysis of appropriate

deference to an agency's recommendation to the Court about what a statute means in a civil action that is completely independent of the agency's enforcement apparatus.

In this context, it is the Court's job, not HUD's, to interpret the accessibility requirements of the FHA. Of course, in so doing, the Court may find it instructive to hear what design features have tended to make dwellings accessible in HUD's experience enforcing the statute. The Supreme Court explained this type of deference in the seminal case *United States v. Mead Corp.*, 533 U.S. 218 (2001): "[A]gencies charged with applying a statute necessarily make all sorts of interpretive choices, and while not all of those choices bind judges to follow them, they certainly may influence courts facing questions the agencies have already answered. The well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Id.* at 227 (alterations and quotation marks omitted). The HUD Guidelines may, in this way, be a useful summary of HUD's relevant experience. A helpful analogy is the way the Government may use the Horizontal Merger Guidelines in antitrust cases in this Circuit. Our Circuit Court has explained in that context that "[a]lthough the Merger Guidelines are not binding on the court," the specific numerical presumptions contained therein "provide a useful illustration" for the court and could be persuasive insofar as it places the case in context by relating it to other instances of problematic conduct. *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 716 n.9 (D.C. Cir. 2001) (citation and quotation marks omitted).

---

data) to carry out this subchapter. The Secretary shall give public notice and opportunity for comment with respect to all rules made under this section."

Likewise, the Government here may reference the HUD Guidelines in order to illustrate how designers and builders typically ensure their dwellings are accessible, and it may put on expert evidence to support that the particular specifications contained in the HUD Guidelines are in fact necessary to make a building accessible to a handicapped person. But I decline to adopt the HUD Guidelines, or any other wholesale set of criteria, as a minimum standard for the Government to make out a *prima facie* case or as the only sufficient way for Post to rebut a *prima facie* showing that a dwelling is actually inaccessible. This conclusion is necessary, in part, because the Government's own expert describes that there are certain specifications in the HUD Guidelines that are more demanding than the equivalent specifications in other safe harbors that HUD has approved. Expert Report of Peter A. Stratton 4 ("P. Stratton Report") [Dkt. #91-2]. For instance, the maximum allowable distance to reach for a light switch is shorter in the Guidelines than in another safe harbor set of criteria known as the ANSI specifications. *Id.* If it were the Government's position, then, that Post's dwellings were inaccessible due in part to the reach to light switches, evidence as to failing the HUD Guidelines specification would not presumptively prove that the light switch was actually inaccessible. But neither can the Court adopt wholesale the ANSI criteria because some of its specifications are more demanding than the equivalent specifications in the HUD Guidelines.

There is another important obstacle to the Government's request that the Court adopt a presumption of inaccessibility from the HUD Guidelines or another set of safe harbor specifications. Indeed, it is in black and white in the text of the FHA. According

to the statute, a state or unit of local government may "review and approve newly constructed covered multifamily dwellings for the purpose of making determinations as to [accessibility under the FHA's design and construction requirements]" and compliance with state or local laws that incorporate the FHA "shall be deemed to satisfy" the FHA's design and construction requirements. 42 U.S.C. § 3604(f)(5). As a result, the Government must show how the state and local codes failed to ensure compliance with the FHA before it is entitled to a presumption of inaccessibility for any building that was in fact permitted and built in a jurisdiction with its own accessibility requirements. The Government does not shift the burden of production on any individual building, therefore, until it explains how the permitting regime for that building did not comply with the FHA or, if it did comply, how a designer or builder such as Post either evaded the permitting regime or wrongfully obtained a permit. And again here, the Government cannot prove that a state or local code failed to ensure compliance with the FHA by comparison to the HUD Guidelines alone. Congress expressed the clear preference that state and local jurisdictions be allowed to define accessibility in this context and I would review the exercise of that authority with due deference. I will discuss this requirement in more detail below when I address which of Post's buildings the Government may introduce as evidence in their pattern or practice case.

In sum, the HUD Guidelines do not set a minimum standard for accessibility under the FHA, whereas compliance with state or local codes could satisfy the FHA. For any permitted building, therefore, the Government must first show the Court that the nature of the permitting regime leaves room for the allegation that the building is evidence of

8

housing discrimination.  Assuming there is reason to doubt that a permit ensured

compliance with the FHA, the Government can then meet its burden of production by

putting on evidence as to what design elements in the building are inaccessible.  The

Government may reference the relevant specification in the HUD Guidelines or any other

safe harbor criteria as persuasive authority, similar to any expert opinion, which will

satisfy its burden of production.  But Post may rebut the evidence on any design element

by reference to the specification from any other safe harbor or to the actual ability of

handicapped individuals to effectively use the design element.  *Accord Fair Hous.*

*Council, Inc. v. Vill. of Olde St. Andrews. Inc.*, 210 Fed. App'x 469, 482 (6th Cir. 2006).

As is typical, the burden of persuasion remains always with the Government—the trier of

fact must ultimately decide if the specification in any safe harbor actually describes what

is necessary for use by handicapped persons.

Accordingly, I DENY the request for a legal ruling that the burden-shifting

framework of the *Nelson* Order applies in this case.  I likewise DENY the Government's

request to find an instance of discrimination under the FHA wherever a Post building

fails to satisfy, wholesale, one of the ten HUD-approved safe-harbors or another

recognized, comparable, objective set of accessibility specifications.  However, I also

reject Post's contention that such a showing "is not sufficient to meet [the Government's]

burdens."  Mem. of P. & A. ISO Defs.' Mot. to Resolve Legal Issues in Advance of Trial

("Post Mem.") 4 [Dkt. #90-1]; *see also id.* at 14-15.  The trier of fact may be persuaded

by the Government experts' opinions that non-compliance with the HUD Guidelines

makes a building inaccessible.[3]

## II.  The FHA "Features of Adaptive Design" Must Be in Place at the Time of Construction.

The Government asks for a legal ruling to clarify that the FHA requires features of

"adaptive design" to be in place at the time of construction and, accordingly, that Post

cannot put on evidence of its ability to quickly modify buildings to include those features

when necessary or requested.  Gov't's Mem. 2.  As two courts before me have so held,

the plain text of the statute indeed supports the Government's interpretation.  *See*

*Baltimore Neighborhoods, Inc. v. Rommel Builders, Inc.*, 40 F. Supp. 2d 700, 708 (D.

Md. 1999); *Mont. Fair Hous., Inc. v. Am. Capital Dev., Inc.*, 81 F. Supp. 2d 1057, 1065

(D. Mont. 1999).

The relevant section of the FHA defines discrimination as "the failure to design

and construct" the covered dwellings "in such a manner that . . . all premises . . . contain

the followings features of adaptive design:

(I)     an accessible route into and through the dwelling;
(II)    light switches, electrical outlets, thermostats, and other environmental controls in accessible locations;
(III)   reinforcements in bathroom walls **to allow later installation** of grab bars; and
(IV)    usable kitchens and bathrooms such that an individual in a wheelchair can maneuver about the space."

---

[3] As to Post's concerns about the scope of the Government expert witnesses' testimony, *see* Post Mem. 15-20, the Government experts will be appropriately limited from testifying to the ultimate question of whether non-compliance with the Guidelines is a violation of the FHA or would lead to an enforcement action before HUD.  They can, however, testify to their knowledge and opinion of the Guidelines being an appropriate metric for accessibility, as described in the FHA.

42 U.S.C. § 3604(f)(3)(c)(iii) (emphasis added).  Because the statute explicitly

contemplates later installing grab bars but does not mention later installation for other

features, I can rule out Post's interpretation that it may add the other features on an as-

needed basis.

Accordingly, I will not allow Post to advance a theory that it complied with the

design and construction requirements to include the features of adaptive design by being

ready to modify dwelling units to include those features.

### III.   The Government Has Failed to Demonstrate That Its Evidence from the Majority of the 50 Subject Properties Is Relevant to a Pattern or Practice Claim.

#### A. Acquired Properties

The parties dispute the relevance of the properties that Post did not design or

construct, but rather acquired.  The Government argues that Post is a successor-in-

liability for all the design and construction violations in the acquired properties.  But that

argument is of no moment in a pattern or practice case.  Post had no obligation under the

FHA to inspect or modify acquired properties, nor did it have any obligation to refrain

from purchasing inaccessible properties.  *Accord J.R. Harding v. Orlando Apartments,*

*LLC*, 748 F.3d 1128 (11th Cir. 2014) (explaining the intent of Congress to incentivize the

original designers and builders and holding purchasers have no duty to ensure compliance

with the FHA).  Therefore, even if Post could be liable under a successor-in-liability

theory for enforcement actions pertaining to the design and construction of each acquired

property, the fact of acquiring these properties is not probative of whether Post had a

standard operating procedure of itself designing and constructing buildings without respect to the accessibility requirements of the FHA.[4]

Accordingly, the Government will not be allowed to introduce at trial evidence of discriminatory design and construction for properties they only acquired: Post Abbey, Post Gallery, Post Heights, Post Square, Post Vineyard, Post Vintage, and Post Worthington.

### B. *Properties Licensed Under State and Local Codes That Incorporate the FHA*

As discussed at pages 7-8 above, Congress invited local jurisdictions to define, in their laws or building codes, a set of criteria that makes precise the broader FHA accessibility requirements. 42 U.S.C. § 3604(f)(5). Because the FHA provides that satisfying such state or local building codes "shall be deemed to satisfy" the FHA accessibility requirements, 42 U.S.C. § 3604(f)(5), Post may have had a bona fide belief that it had satisfied the FHA requirements by obtaining permits and certificates of occupancy for its buildings in jurisdictions that incorporated the FHA.  There is no

---

[4] The Government concedes that Post was not involved in the design and construction of five of the ten acquired properties (Post Abbey, Post Square, Post Vineyard, Post Vintage, and Post Worthington), but asserts that Post was "directly involved in the design or construction" of five others (Post Coles Corner, Post Gallery, Post Heights, Post Addison Circle, and Post Uptown Village Phase II). U.S.'s Opp'n to Defs.' Mot. ("Gov't's Opp'n") 22 [Dkt. #94].  Though Post denies that assertion, the Government points to some evidence from people with knowledge of the design and construction process for (1) Post Coles Corner, (2) Post Addison Circle, and (3) Post Uptown Village Phase II. *See id.* at 23 & n.6; *see also* Defs.' Resps. & Objections to Pl.'s Second Set of Interrogs. 6-7 [Dkt. #92-6].  The Government may therefore use evidence of Post's involvement in the design and construction of those three acquired properties.  For Post Gallery and Post Heights, on the other hand, I reject the argument that Post was involved in their design and construction.  By way of support, the Government offers only that those properties did not receive certificates of occupancy until after Post acquired them.  It is too tenuous to infer that design and construction occurs up until a certificate of occupancy is issued.  Moreover, Post specifically denied being involved in the design and construction of those properties. Defs.' Resps. & Objections to Pl.'s Second Set of Interrogs. 6-7.

dispute that Post obtained the necessary permits for each of its buildings, but if these permits should not create a presumption of compliance, the Government has not presented evidence as to why. To the contrary, the Government admits that the state laws of North Carolina, Georgia, and Virginia (after the year 2000) incorporate the Fair Housing Act requirements into their building codes. *See* Errata to the U.S.' Args. to the Court at the Mots. Hearing Held on July 11, 2016, at 2 [Dkt. #105].

Instead of explaining the permitting schemes under which the Post buildings were designed and built, the Government argues that it should be able to use evidence from permitted buildings to support its pattern or practice claim by pointing to paragraph (f)(6)(B) of §3604, which states "Determinations by a State or a unit of general local government … shall not be conclusive in enforcement proceedings under this subchapter." But this is not an enforcement proceeding in which the Court is merely determining whether a particular construction design meets the standard for accessibility under the FHA. Rather, the Government's allegation is that Post flouted the FHA requirements as a standard operating procedure. But it is not reasonable to conclude that Post disregarded the FHA if it attempted to comply with a safe harbor by resting on the state and local codes, regardless whether those codes turn out to be too lax. Because the Government may not rely on evidence from buildings for which Post had a permit and a bona fide belief that the permit ensured compliance with the FHA, I will exclude from evidence each permitted building where nothing in the record would challenge this bona fide belief. I will now turn to evaluating the evidence in the record and on the books for each relevant jurisdiction:

13

### i.   Georgia Properties

Although the parties dispute the exact date range in which the Georgia properties were designed and constructed, neither party argues that any of the properties were built and permitted before 1987, when Georgia appears to have adopted a permitting process consistent with satisfying the FHA. *See* Defs.' Reply to U.S.'s Resp. to Defs.' Statement of Material Facts ("Material Facts") ¶¶ 5-7, at 3-5 [Dkt. #73-1]. Georgia state law requires that all "facilities receiving permits for construction or renovation" built between 1987 and 1995 must "comply with the American National Standards Institute specifications A117.1-1986" and all of those built after 1995 must comply with the Fire Safety Commissioner's "rules and regulations" establishing "minimum state standards for accessibility." Ga. Code Ann. § 30-3-3. It appears those minimum standards were promulgated as the Georgia Accessibility Code, various editions of which are available at https://ada.georgia.gov/georgia-accessibility-code.

The Georgia Accessibility Code also instructs the permitting authorities to enforce the code's requirements by issuing building permits only to those projects with plans that meet with the requirements of the Code. *See* Ga. Accessibility Code 120-3-20.02(3). The substantive requirements for multifamily dwellings are enumerated in detail at Ga. Accessibility Code 120-3-20.54. The Government's own expert conceded that the specifications were based on ANSI 117.1-1986 and thus operationalized the requirements of the Fair Housing Act. Expert Report of Kenneth M. Schoonover ("Schoonover Report") 16 [Dkt. #92-3]. Post is therefore entitled to a presumption at the outset of the Government's case that its buildings permitted in Georgia were designed and built in

14

compliance with the FHA. Unless the Government can show how the Georgia permitting process was defective at certifying compliance with its own code, or otherwise demonstrate that Georgia's stamp of approval is not synonymous with meeting the requirements under the FHA, it has not met its burden under the statute to show that the design and construction of those buildings was discriminatory or in any way relevant to its pattern or practice case.

In a convoluted bit of logic, the Government's expert concludes that the buildings constructed in Georgia must not have met the Georgia codes, even though they were ostensibly permitted by the Georgia authorities, because they do not satisfy the HUD Guidelines. *Id.* But, as should be abundantly clear by now, the HUD Guidelines are not the minimum specifications required by the FHA and the Government points to no evidence that satisfying the Georgia Accessibility Code would necessarily entail satisfying the HUD Guidelines. Whether the buildings satisfy the HUD Guidelines is of no moment and it is fair to assume until the Government shows otherwise that the Georgia buildings, which neither party disputes were in fact permitted, satisfied the Georgia Accessibility Code and, thus, the FHA.

Therefore, I will exclude any testimony as to the Georgia buildings for the purpose of proving that Post is liable for a pattern or practice of discrimination under the FHA. As I read the Complaint, the buildings to be excluded from evidence are Post Alexander, Post Biltmore, Post Briarcliff, Post Brookhaven, Post Collier Hills, Post Crest, Post Crossing, Post Dunwoody, Post Gardens, Post Glen, Post Lenox Park, Post Lindbergh, Post Oglethorpe, Post Parkside, Post Peachtree Hills, Post Renaissance, Post Ridge, Post

15

Riverside, Post Stratford (all located in Atlanta, Georgia), and Post Stratford (in Smyrna, Georgia).

### ii.    North Carolina Properties

As in Georgia, the law in North Carolina calls for state building inspectors to issue permits and certificates of "compliance" or occupancy only if a building meets with the North Carolina Building Code. *See* N.C.G.S. §§ 160A–411 to –425; *see also Lynn v. Overlook Dev.*, 403 S.E.2d 469 (N.C. 1991) (describing the duties of the local authorities in the permitting process as of the late 1980s). It is not obvious to the Court when the North Carolina Building Code began incorporating the requirements of the FHA, but it is at least clear that the code has incorporated accessibility requirements since 1991.[5] Moreover, the Government's expert admitted that the North Carolina Accessibility Code applicable in 2002, when the Post Gateway Place was designed and constructed for first occupancy, did incorporate specifications that satisfied the FHA. Material Facts ¶ 6 (Post Gateway Place designed and constructed for first occupancy in 2002); Schoonover Report 16 (in considering whether Post Gateway Place met with the applicable accessibility code, Schoonover notes that its "technical requirements mirror the Guidelines"). It therefore appears that the building permits issued in North Carolina create a presumption of satisfying the FHA. Unless the Government can put forward

---

[5] *See* North Carolina Dep't of Insurance, Office of the State Fire Marshall, Engineering and Codes, State Building Codes, http://www.ncdoi.com/OSFM/Engineering_and_Codes/Default.aspx?field1=Codes_-_1991&user=State_Building_Codes; 1991 Ed. of North Carolina State Building Code, http://www.ncdoi.com/OSFM/Engineering_and_Codes/Documents/State_Building_Codes/PastCodes/1991/1991%20with%20Revisions%20Thru%201995.pdf.

contrary evidence, it will therefore not be allowed to use Post's North Carolina properties to make its case of a pattern or practice of discrimination.

As I read the Complaint and the parties' submissions as to the undisputed material facts in the case, the buildings to be excluded from evidence on this conclusion are Post Ballantyne (certified in 2006), Post Gateway Place (certified in 2002), Post Park at Phillips Place (certified in 1997)[6], and Post Uptown Place (certified in 2002), which are all located in Charlotte, North Carolina.

### iii. New York Properties

Post Luminaria and Post Toscana are the only New York properties the Government seeks to introduce. Compl. ¶ 5. The Government's expert seems to have conceded that the Post Luminaria, at least, was permitted according to New York Local Law 58, Schoonover Report 16-17, which law appears to have created accessibility requirements for the local code in 1987.[7] The Government expert's only basis for discounting compliance with New York law is that the accessibility requirements of Local Law 58 are less restrictive than the HUD Guidelines. *See* Schoonover Report 16-17. But, as with Georgia, the Guidelines are not the minimum standard for accessibility and satisfying the specifications in the local code can be enough. Moreover, the expert report indicates New York's specifications are based on the ANSI standards, *see*

---

[6] Unlike with the properties certified in 2002 and later, it is unclear to the Court if the North Carolina Building Code incorporated a threshold level of accessibility specifications in 1997, when Post Park at Phillips Place was permitted. But as the burden is with the Government to demonstrate the relevance of its evidence, the property will be excluded until the Government makes a showing that the permitting scheme in place in 1997 was deficient.

[7] *See* Local Laws of the City of New York for the Year 1987, No. 58, http://www.nyc.gov/html/mopd/downloads/pdf/local_law58.pdf.

Schoonover Report 17, which is another safe harbor that the statute specifically approves, 42 U.S.C. § 3604(f)(4).

There does appear to be one way in which New York's local code falls short of the federal standard under the FHA, but it is irrelevant here. As the Government's expert indicates, the New York law may require fewer dwelling units in non-elevator buildings to be compliant than is required by the FHA, *see* Schoonover Report 17. However, the Government represents that the Post Luminaria and the Post Toscana are elevator buildings, making the non-elevator provision unrelated to the permitting of these two buildings. *See* U.S.'s Statement of Undisputed Material Facts ISO Its Motion for Summary Judgment ¶¶ 62 & 129 [Dkt. # 63-2]. Accordingly, the Government will not be allowed to introduce evidence of the Post Luminaria or Post Toscana at trial unless it can show some defect in the permitting process as to those buildings.

### iv.    Florida Properties

All the Florida properties will be allowed into evidence because the Government has put forward what seems to be an undisputed account that the Florida Accessibility Code "contains no comprehensive technical requirements" and that Florida law merely repeats in general terms the FHA's accessibility requirements. *See* Schoonover Report 18. As such, there is at least an initial showing by the Government that Florida's permitting process, whatever it might be, is not calculated to ensure accessibility that satisfies the FHA. Post may present evidence to the contrary at trial.

### v.   Virginia Properties

The Government has submitted evidence that, before 2000, the Virginia Uniform Statewide Building Code explicitly adopted the HUD Guidelines as its set of accessibility specifications.  Schoonover Report 18.  For these properties, then, the Government's evidence of non-compliance with the Guidelines would rebut the presumption of complying with state and local codes.  Conversely, for properties permitted after 2000, the Virginia code incorporated the accessibility specifications from the International Building Code 2000, with the 2001 supplement (hereinafter "IBC-2000").  *Id.*  Therefore, the Government can rebut the presumption of satisfying the state and local codes for these properties only by showing non-compliance with the IBC-2000, or some direct evidence of obtaining the permits erroneously.  It appears that the Government did study the Pentagon Row for non-compliance with the IBC- 2000 (and with all other safe harbors), P. Stratton Report 9-11, but there is no such evidence as to the rest of the Virginia properties.  Accordingly, I will allow evidence as to Pentagon Row if it shows non-compliance with the IBC-2000, but I will exclude all the other Virginia properties that were designed and constructed for first occupancy after 2000.

As I read the Complaint and material facts, those Virginia properties that will not be admissible evidence of a pattern or practice of discrimination are Post Carlyle Square

and Post Carlyle Square Condos.  Both properties are located in Alexandria, VA and were certified after 2005. Compl. ¶ 5; Material Facts ¶ 6.[8]

### vi.   District of Columbia Properties

Post Massachusetts Avenue in the District of Columbia is one of the twelve properties that the Government inspected pursuant to the October 31, 2012 Joint Status Report [Dkt. #38] and the December 14, 2012 Scheduling Order [Dkt. #43].  Post effectively conceded through its responses to interrogatories that there was no local code applicable to the Post Massachusetts Avenue that would have brought it within the requirements of the FHA.  *See* Defs.' Third Supp. Resps. & Objections to Pl.'s First Set of Interrogs., at App. 5033 & Ex. A [Dkt. #67-23]; Schoonover Report 15-20 (discussing the subset of properties for which Post did claim that local codes satisfied the FHA).  Accordingly, I will allow evidence from Post Massachusetts Avenue.

### vii.   Texas Properties

The Court is unaware of any attempt by the Government to show why state or local permitting in Texas did not satisfy the FHA with respect to the Post buildings there.  Post put the Government on notice of the local codes theory for its Texas buildings. *See e.g.*, Defs.' Third Supp. Resps. & Objections to Pl.'s First Set of Interrogs., at App. 5040 ("Meeting agendas and reports show that, during the design and construction process, Inspec conducted a review of Addison Circle for compliance with the Texas Accessibility

---

[8] The only remaining Virginia property (besides Post Pentagon Row) is Post Corners, located in Centreville, Virginia. Post admits that property was designed before 1991, making the 2000 code inapplicable, and hence making the property admissible.  Material Facts ¶ 5.

Standards"); *Id.* at App. 5081-86 (table of buildings indicating local codes as an objective

standard on which compliance with the FHA requirements was based); Defs.' Resp. to

Pl.'s Statement of Undisputed Material Facts ¶ 19 [Dkt. #67-1] ("In Texas, project plans

would be reviewed by the State of Texas to make sure that it was designed to meet the

state accessibility requirements. ... [T]he government failed to conduct] any analysis of

whether properties met state codes."); *see also* Defs.' Resp. to Pl.'s Errata 2 [Dkt. #106].

The Government did not elect to inspect any of the Texas buildings. *See* Joint Status

Report [Dkt. #38].  Therefore, I will consider deficient the Government's *prima facie*

evidence as to the Texas buildings.

### C. *Properties the Government Did Not Inspect*

Post argues that the Government has no expert testimony with regard to the

accessibility conditions at thirteen properties, *see* Post Mem. 23 (listing properties), and

therefore any mention of these properties should be excluded from trial.  But the

Government does have evidence of the measurements of features in those properties. *See*

Gov't's Opp'n 25-26.  It may also be able to introduce evidence of citizen or tester

complaints. *See id.*  If the Government is able to establish through experts what

specifications make a dwelling unit inaccessible, then its evidence of these thirteen

properties falling short of those specifications could be probative of discrimination even

though an expert might not testify to his or her conclusions about the property.

Therefore, these thirteen properties will not be excluded from evidence on this basis alone.[9]

### D. Properties Allowed to Be Introduced At Trial

To summarize the above, the Government has not met its burden to show why 42 of the 50 subject properties named in the Complaint are relevant to the pattern or practice claim.  The remaining properties the Government may introduce evidence at trial are:

1.  Post Corners (Centreville, VA)

2.  Post Harbour Place (Tampa, FL)

3.  Post Harbour Place City Homes (Tampa, FL)

4.  Post Hyde Park (Tampa, FL)

5.  Post Massachusetts Avenue (Washington, DC)

6.  Post Parkside (Orlando, FL)

7.  Post Pentagon Row (Arlington, VA)

8.  Post Rocky Point (Tampa, FL)

## IV.   Conclusion

For all of the foregoing reasons, the Government will be limited to supporting its pattern or practice claim at trial with evidence from the eight properties listed above.  It will be allowed to introduce evidence of the allegedly deficient design features in those buildings by reference to the specifications in the HUD Guidelines, or other safe harbor

---

[9] Note that, by my observation, it is only Post Corners and Post Hyde Park among these thirteen that are not excluded on other grounds.

specifications.  It will *not* be allowed to have experts testify as to whether failing the

HUD Guidelines would result in a rebuttable presumption or a finding of liability in an

enforcement action before HUD.

Post will then be allowed to put on evidence of safe harbor specifications or state

and local codes that those challenged design features satisfied.  It may also show that

handicapped persons could actually access and use those design features.  Post will *not* be

allowed to argue or put on evidence to support the argument that the challenged

properties could quickly "adapt" to become accessible.

Both sides will also be allowed to put on evidence of Post's decision-making

process when designing and constructing any buildings in the relevant period.

An order consistent with this decision accompanies this Memorandum Opinion.


RICHARD J. LEON
United States District Judge